GANN *v.* STATE.

4171 141 S. W. 2d 834

Opinion delivered June 24, 1940.

*Ras Priest,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

HUMPHREYS, J. Information was filed in the circuit court of Jackson county by the prosecuting attorney of the Third Judicial Circuit of Arkansas, in which Jackson county is situated, accusing appellant, Frank G. Gann, of the crime of rape, committed as follows: That said Frank G. Gann, on the 9th day of December, 1939, did then and there willfully, unlawfully, forcibly and feloniously and with malice aforethought, make an assault upon Louise Gann, a female, and her, the said Louise Gann, did then and there feloniously and forcibly ravish and carnally know her, against the peace and dignity of the State of Arkansas.

Appellant entered a plea of not guilty, and was tried on the charge on February 7, 1940, resulting in a verdict of guilty, in which the jury fixed his punishment in the state penitentiary for his natural life. From this verdict and judgment based thereon appellant has duly prosecuted an appeal to this court.

The contention for reversal of the verdict and judgment is that the state failed to show the degree of force necessary to establish the crime of rape, and that the

prosecutrix herself testified that the threats relied upon by the state were not made until after the alleged rape was committed.

The record reflects that the prosecutrix, who will be referred to hereafter as Louise, was under 16 years of age on the date of the alleged crime; that she was residing on a farm with her family, consisting of her father, three brothers, and two sisters; that her mother died six years before the alleged crime was committed; and that Louise kept house and did the cooking for the family, that at said time the two older brothers were away from home visiting their uncle at Lake City, and that Louise and her 12-year old brother and two little sisters were at home.

Relative to the occurrence on the night of December 9, 1939, Louise testified in the main as follows: "Q. What time did your father come in that night, Louise? A. It was somewhere close to eleven o'clock. He said it was fifteen until eleven or fifteen after eleven, I forget which he said. Q. That was on Saturday night? A. Yes, sir. Q. Tell the jury now just what was said and what was done after your father came home? A. Well, when he came in, why, me and my least sister were in bed and my brother and little sister next to the least one, they were sitting up playing. So, when he came in, he came in and kindled up the fire and he acted like he was mad because they were sitting up playing and he got the poker and went to kindling up the fire. I saw he was standing there with it in his hand and he looked over and started working with the map on the dresser with it and he knocked the lamp out and he looked over across the bed at me and wanted to know where Doug was at, then and he told Doug to get over in my bed and he told me to get over in his bed. I told him there was room enough there for Doug and all of us and he says: 'You heard what I said.' So I had to go over there and when I got in bed, why, he began playing around over me. Q. Did he get in bed with you? A. Yes, sir. When he came to bed, why, began playing around over me and I would ask him

to quit and he said it didn't hurt anything. So I began crying and he got the gun after me and told me he was going to shoot me. And so, when he got the gun he turned around and told me he wouldn't shoot me, but he would take the gun and knock me in the head with it. So, he made me lie down—I had raised up in bed—and he made me lie down. Q. What kind of gun was it? A. It was a 22. Q. Go ahead. A. So, I lay down in the bed and he got back in the bed and began feeling around over me again. I asked him to quit. So he got his knife out and I begged him to let me have his knife. So he kept feeling around over me and I was asking him to quit and finally I got him to let me get up and go outside. I taken the knife outside and when I came back in he wanted his knife back and asked where it was at. I told him it was outside. And he began fussing and wanting his knife so I had to give it to him. And then he kept on and kept on and then he done what he did. Q. What did he do? A. He raped me. Q. Did he have sexual intercourse with you? A. Yes, sir. Q. Did you consent to it? A. No, sir. Q. Did he make you? A. Yes, sir. Q. Against your will? A. Yes, sir. Q. Did you fight him? A. No, sir; I knew not to. Q. Why did you know not to? A. Afraid he would kill me. (Witness begins weeping). Q. About what time of night was it? A. It was about eleven thirty. Q. About forty-five minutes after he came in? A. Yes, it was between eleven and twelve. Q. Well, did anything else happen that night? A. Just after that, why, he told me that if I told it on him, why, he would kill me. And then he kept on fooling around over me and then he told us that we could go to sleep if we could and he would call us next morning at four o'clock and he was going to kill us kids and then set the house afire and kill himself. Q. Did he have anything else to do with you that night? A. Yes, sir, twice more. (Witness continues to weep). Q. He had sexual intercourse with you twice more then? A. Yes, sir. Q. Were you afraid of him, Louise? A. Yes, sir. Q. Were you afraid he would kill you if you didn't give in

to him. A. Yes, sir. Q. Had he told you he would? A. Yes, he had threatened to kill me several times. Q. Is that the first time he had ever gotten in bed with you? A. No, sir; it wasn't the first time he had ever got in bed with me, but it was the first time he had ever done anything like that. Q. How long before that had he gotten in bed with you? A. I don't know just how long it had been, but it had been a pretty good while. Q. That was on Saturday night? A. Yes, sir. Q. How long had that been going on, that he would get in bed with you? A. Well, it had been going on at least half a year, if not longer. Q. What did you do the next day? A. Well, I didn't do nothing. My girl friend came over to the house and I told her about it, and then that evening I started over to her house and stopped at my neighbors and I told her about it. And so she told me she thought it would be best to write to my uncle. So I wrote him the next Monday when I went to school. Q. Did you stay there until the officers came and got you? A. Yes, sir; I was over at my girl friend's having a dress made whenever they came after me. Q. Where were you living at the time this happened? A. On the Holden farm. Q. In Jackson county? A. Yes, sir. Q. In December, 1939? A. Yes, sir. (Witness still continuing to weep). Q. Is Frank Gann, the defendant here, your father? A. Yes, sir."

On cross-examination Louise admitted that, after her father was arrested, she voluntarily told the officers that her first statement to them about her father raping her was untrue, but did so because her father told her about how badly he was treated when in the penitentiary before, and she felt sorry for "Daddy". She later recanted and told the officers her first statement was true, and that her statements to the jury were true.

Her 12-year old brother, Doug, testified concerning the occurrence after their father came home on the 9th day of December, 1939, as follows: "Q. What time did your father come home that night? A. Something about like twelve o'clock. Q. Something about

like twelve? A. Yes, sir. Q. Can you tell the time, son? A. No, sir. Q. You cannot tell the time? A. No, sir. Q. What happened there that night, son? A. Well, when he came in he just made Louise get in bed with him. (Witness begins crying and while crying continues to testify). And he began to feel around over her. Q. What is that? A. I said he began feeling around over her. Q. Did she say anything, son? A. Yes, she told him to quit. Q. Did she say anything else? A. Yes, sir; she told him to quit, that she wanted to live right like mother did. (Witness continues weeping). Q. Do you know what they did in bed there, did you see anything? A. No, sir. Q. Did you hear her crying any more that night? A. Yes, sir. Q. How many times? A. She cried nearly all night. Q. Nearly all night? A. Yes, sir. (Still weeping). Q. Well, what did he do before he made her get in bed with him? A. Well, he just told her, he said he aimed to kill us. Q. That he aimed to kill you all? A. Yes, sir. Q. Well, did you do anything, son? A. Yes. He got the poker and the knife and the gun. (Witness crying so he cannot continue his answer). Q. What kind of gun? A. It was a 22. Q. Was that before he made Louise get in bed with him? A. It was after when he got the gun. (Witness still crying). Q. Well, was it before Louise asked him to let her alone and let her be like her mother? A. No, sir. (Witness still weeping)."

Doug admitted, on cross-examination, that two or three days after his father was arrested, while he was staying at their Uncle John Gann's, he and his sister got into a little racket, and while he was mad he accused his sister of telling a lie on her father.

Appellant argues that, according to the testimony of Louise, the threats that put her in fear and caused her to yield to the entreaties and passion of her father were made after—not before—the act of sexual intercourse.

We do not interpret her evidence in that way. According to her evidence, appellant first made his little

son exchange beds, and he then got in bed with his daughter and began feeling over her, and when she begged him to quit he got a gun and threatened to shoot her, but changed his mind and said he would knock her in the head with it. Then, after feeling over her again, and while she was begging him to quit, he got his knife, but finally let her have it and allowed her to get up and go outside. She left the knife outside, but when she came back in the house he made her get his knife, and after she gave back his knife he kept on and on until he succeeded in raping her.

She said she did not consent to the act of sexual intercourse, but that he made her do it against her will. She admitted that she did not fight him, but said the reason she did not do so was because she was afraid he would kill her.

It is true that, after he accomplished his purpose, he made other and additional threats, according to her testimony, to the effect that he would wake them up at 4 o'clock the next morning and kill all of them, set the house afire and kill himself.

There is no merit in appellant's contention that all the threats were made after appellant accomplished his purpose. Most of them were made before he did so. For example, the gun and knife play were made before the act was committed.

There is no merit in appellant's contention that Louise did not resist with all the strength in her body. She explained that she did not fight her father off because he would have killed her, but, in the same breath and in tears, she said she never consented or willingly yielded to him.

There is no merit in appellant's contention that he did not use sufficient physical force to constitute the crime of rape, under the law. Brute force is not a necessary ingredient of rape.

This court said in the case of *Crawford* v. *State,* 132 Ark. 518, 201 S. W. 784: ". . . The child testified

that on that day she and one of her companions were going along one of the halls in the orphanage and that the defendant caught hold of her and pulled her into a room and locked the door and had sexual intercourse with her. She stated that, over her objections, he completed the act of intercourse—that she cried out in pain, but desisted on account of his insisting that she keep quiet. She testified also that she submitted to his embraces because of his authority over her as superintendent. The testimony was sufficient to make out the crime of rape as alleged in the indictment, . . ." So far as the necessity for using force is concerned, the Crawford case, *supra,* controls this case.

Again, this court said in the case of *Zinn and Cheney* v. *State,* 135 Ark. 342, 205 S. W. 704: "It is essential that she shall not at any time consent, but none of the cases on the subject hold that she has consented because, through fear for her life or bodily safety, she has ceased to resist or fails to make an outcry. . . ."

Appellant argues that because his daughter returned after she had gone outside, this is proof conclusive that she consented to the sexual intercourse. She testified positively that she did not consent to the act, but begged her father to let her alone, but that he kept on and on until he raped her.

The evidence of Louise was sufficient to make out the crime of rape, and the court did not err in refusing to instruct a verdict of not guilty at the request of the appellant.

The judgment is affirmed.