Lonnie **MITCHELL**, Appellant,

v.

Dan D. **STEPHENS**, Superintendent of Arkansas State Penitentiary, Appellee.

No. 17835.

United States Court of Appeals
Eighth Circuit.

Nov. 24, 1965.

Christopher Mercer, Sidney S. McMath and John P. Sizemore, Little Rock, Ark., for appellant.

Bruce Bennett, Atty. Gen., of Arkansas, and Jack L. Lessenberry, Chief Asst. Atty. Gen., for appellee.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

Again we are confronted with a habeas corpus attack on an Arkansas state court conviction and death sentence for interracial rape. The case presents issues which, in this day, are sensitive. Some of them are similar to those we have considered recently in Bailey v. Henslee, 287 F.2d 936 (8 Cir. 1961), cert. denied 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78; Henslee v. Stewart, 311 F.2d 691 (8 Cir. 1963), cert. denied 373 U.S. 902, 83 S.Ct. 1289, 10 L.Ed.2d 198; and Maxwell v. Stephens, 348 F.2d 325 (8 Cir. 1965), cert. denied 86 S.Ct. 387.

Lonnie Mitchell, Jr., a Negro with a sixth grade education and, apparently, no prior criminal record, was convicted by a jury in the Circuit Court of Union County, Arkansas, of the crime of rape as defined by § 41–3401, Ark.Stat. (1947). The offense was committed in El Dorado on or about March 10, 1959. Mitchell at the time was 23 years of age. The victim was a white woman, a widow, 77 years of age and crippled by arthritis. She was a witness at the trial but since then has died of natural causes. The jury, upon finding the defendant guilty, did not exercise the right it possessed under §§ 41–3403 and 43–2153 to render a verdict of life imprisonment at hard labor. As a consequence, under Arkansas law, the death sentence was imposed.[1] The conviction was appealed to the Supreme Court of Arkansas and there affirmed. Mitchell v. Arkansas, 230 Ark. 894, 327 S.W.2d 384 (1959). Through this point Mitchell was represented by court-appointed counsel in the person of J. S. Thomas of the El Dorado bar.

Since this initial appeal Mitchell has been represented by retained counsel.

1. Kelley v. State, 133 Ark. 261, 202 S.W. 49, 54 (1918); Bullen v. State, 156 Ark. 148, 245 S.W. 493, 494 (1922); Clark v. State, 169 Ark. 717, 276 S.W. 849, 853–854 (1925); Smith v. State, 205 Ark. 1075, 172 S.W.2d 248, 249 (1943); Turner v. State, 224 Ark. 505, 275 S.W.2d 24, 31 (1955); Stewart v. State, 233 Ark. 458, 345 S.W.2d 472, 475 (1961), cert. denied 368 U.S. 935, 82 S.Ct. 373, 7 L.Ed.2d 197.

He first moved to vacate the judgment on a number of grounds. This motion was denied by the trial court. On appeal the denial was affirmed. Mitchell v. State, 232 Ark. 371, 337 S.W.2d 663 (1960). Mitchell then filed a petition for a writ of habeas corpus in the Jefferson County Circuit Court (where the state penitentiary is located). He there alleged many of the same points which had been asserted in the prior motion to vacate. The trial court dismissed this application. The State Supreme Court granted an appeal but affirmed the trial court's action. Mitchell v. State ex rel. Henslee, 233 Ark. 578, 346 S.W.2d 201 (1961). Mitchell then filed an original application with the Supreme Court of Arkansas for permission to file a petition for a writ of error coram nobis in the trial court relative to his sanity at the time of trial. This application was denied. Mitchell v. State, 234 Ark. 762, 354 S.W. 2d 557 (1962).

With this lack of success in the state courts, Mitchell instituted a habeas corpus proceeding in forma pauperis in the United States District Court for the Eastern District of Arkansas. This petition was denied primarily on grounds of waiver and failure to exhaust available state remedies. Mitchell v. Henslee, 208 F.Supp. 533 (E.D.Ark.1962). We reversed, 332 F.2d 16 (8 Cir. 1964), in the light of the intervening decision in Fay v. Noia, 372 U.S. 391, 438–439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). On the remand Judge Young, after a full hearing at which Mitchell himself testified and in which the state trial record was introduced, denied the petition once more and filed a lengthy and thoughtful opinion in support of his conclusions. Mitchell v. Stephens, 232 F.Supp. 497 (E.D. Ark.1964). Mitchell again appeals.

When this case was on the calendar of an earlier term and no brief had appeared for Mitchell, we appointed counsel to act for him on the appeal. By the time of the rescheduled oral argument we were favored with briefs from both retained counsel and court-appointed counsel.

Here, too, as in the other cases of this type, the defendant's guilt or innocence of the rape charge is not now before us. We have, however, carefully read and are familiar with both the transcript of the state court trial and the transcripts of the federal habeas corpus proceeding.

The state record discloses that on March 6, 1959, the victim employed Mitchell to rake leaves in her yard and that on the evening of March 9 he had been drinking. Late that night someone entered the victim's home by cutting a screen, attacked her with a knife, assaulted her, and made off with her purse and currency. She reported the incident to the El Dorado police at approximately two a. m. on the morning of March 10.

Mitchell was arrested about an hour after the crime was reported and was booked at 3:10 a. m. The arrest took place at his mother's home where he was living. An information was filed that day charging him with the crime of robbery. About 9:30 a. m. he was transferred by the city police to the custody of the sheriff and confined in the county jail. He was arraigned on the robbery charge on the morning of March 11 and Mr. Thomas was then appointed to represent him. He was arraigned on a charge of rape on March 16 and Mr. Thomas was then appointed to represent him on that charge. Trial ensued two weeks later.

Both counsel for the defense raise here a number of constitutional issues. They are:

1. Because of the methods employed in the selection of his jury, Mitchell was denied the equal protection of the laws.

2. Because of the discriminatory application of the death penalty for rape in Arkansas, Mitchell was denied equal protection and the privilege against cruel and unusual punishments.

3. Because of the admission of his rape confession in evidence, Mitchell was denied due process and the privilege against self-incrimination.

4. Because of ineffective representation by his court-appointed trial coun-

sel, Mitchell was denied due process. and the right to have the assistance of counsel for his defense.

Retained counsel also raises, as a fifth point, the issue of Mitchell's sanity at the time of the offense and at the time of the trial.

No attack is made here upon the legality of Mitchell's arrest. No search or seizure issue is presented. There were two confessions offered and received in evidence. The first related only to the robbery; the second related to the rape. The admission of the robbery confession is not contested. We take up, in turn, the five asserted issues:

The selection of the petit jury

■ This court has not been insensitive to constitutional claims based upon race. See, for example, Aaron v. Cooper, 257 F.2d 33 (8 Cir. 1958), aff'd 358 U.S. 1, 78 S.Ct. 1399, 3 L.Ed.2d 3; Bailey v. Henslee, supra, 287 F.2d 936; Henslee v. Stewart, supra, 311 F.2d 691; and Mitchell v. Henslee, supra, 332 F.2d 16. "But purposeful discrimination may not be assumed or merely asserted. * * * It must be proven." And the burden is on the one who asserts discrimination. Swain v. State of Alabama, 380 U.S. 202, 205, 209, 85 S.Ct. 824, 827, 13 L.Ed. 2d 759 (1965); Tarrance v. State of Florida, 188 U.S. 519, 520, 23 S.Ct. 402, 47 L.Ed. 572 (1903).

The parties recognize, of course, that in the present case a motion to quash the first panel, on the grounds of discriminatory selection, was granted without opposition by the State; that the court instructed the jury commissioners to select a new panel without racial discrimination; that the resulting regular and alternate panels contained Negro names; and that the jury finally selected included two Negroes. No objection was made as to the new panel. The defense, however, now stresses the facts that the new panel was selected by the same jury commissioners and that it contained some persons who were on the first panel. It asserts a lack of acquaintanceship by the jury commissioners with potential jurors in the Negro community and argues that the commissioners acknowledged that, although they had contact with Negroes, they did not know very many and that they made no positive effort to acquaint themselves with Negro citizens. In Bailey v. Henslee, supra, pp. 943 and 947 of 287 F.2d, we observed that "In avoiding racial discrimination in the selection of jurors it is not enough for the jury commissioners or any other selecting agency to be content with persons of their personal acquaintance", citing Smith v. State of Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Hill v. State of Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); and Cassell v. State of Texas, 339 U.S. 282, 289, 70 S.Ct. 629, 94 L.Ed. 839 (1950), and that the testimony of the jury commissioners there as to their efforts to ascertain the names of qualified Negroes "leaves much to be desired". We in effect said the same thing in Henslee v. Stewart, supra, p. 694 of 311 F.2d. We regarded a deficiency in jury commissioners' methods as one of the factors which, in the aggregate, led us to the conclusion, in each of those cases, that a petition for a writ of habeas corpus was to be conditionally granted. The testimony of the commissioners in Bailey and Stewart, set out in the footnotes on p. 947 of 287 F.2d and p. 694 of 311 F.2d, is self-condemning and discloses lack of diligence and an emphasis on obtaining proportionate representation.

■ The defense case here, too, rests on the testimony of the commissioners who selected the list from which Mitchell's jury was chosen. We have read that testimony. Judge Young's summary of it at pp. 505–506 of 232 F.Supp. is accurate. We feel that it reveals sufficient knowledge of Negroes on the part of the three commissioners (the first an employee of a chemical plant and an officer of a union having Negro members; the second a hotel manager who hired Negro employees; the third a lumber company payroll clerk and local school board member for 15 years; and all long-

time residents of the area), sufficient efforts by them to acquaint themselves with the Negro community of Union County, and an absence of emphasis on formal proportionate representation, so as to escape constitutional infirmities of the kind we felt were present in Bailey and Stewart.

The defense next refers to the racial designations employed on the county poll tax book, as compelled by § 3–118, Ark. Stat. (1947), and the use of that book by the jury commissioners. The testimony is that the commissioners did not consult the poll tax book until after a prospective juror's name had been tentatively selected. This ultimate reference was necessary so that the commissioners could be sure that the persons on their list were electors, § 39–208, who in turn were persons who had paid the poll tax. Ark.Const., Art. 3, § 1; Ark.Stat., § 3–104.2. [The poll tax requirement and, consequently, its color references have since been eliminated by Amendment 51 to the Arkansas Constitution, effective January 1, 1965].

■ This constitutional issue was presented and was decided adversely to the defense in Maxwell v. Stephens, supra, 348 F.2d 325. We noted there, pp. 333–334, the disturbing aspect of the use of race identification marks in the poll tax list and the possible unconstitutionality of the Arkansas statute requiring that identification. But present there, as here, was the pertinent fact that the initial selection of jurors was made apart from and independently of the poll tax list and that the latter was used only as a check to assure compliance with the elector requirement of the statute. We adhere to our decision in Maxwell on this point and hold that the defense attacked on the constitutionality of this second aspect of the selection of the jury is not sustainable.

This conclusion makes it unnecessary, as in Maxwell, to consider the State's alternative and additional argument that, in any event, Mitchell effectively waived all objections to the petit jury panel within the permitted scope of Fay v. Noia, supra, pp. 438–440 of 372 U.S., 83 S.Ct. 822.

### The death penalty

The defense arguments are (a) that the Arkansas statutes, §§ 41–3403 and 43–2153, permitting the death penalty for rape, although concededly fair and constitutional on their face, have been discriminatorily applied in violation of the equal protection clause [2] and (b) that the penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.[3] Again, both these constitutional issues were present and were considered and decided adversely to the defense in Maxwell v. Stephens, supra, pp. 328–332 of 348 F.2d.

■ The evidence here which is new or different from that in Maxwell consists only of state records to the effect that no Negro and only one white man has ever before received a death sentence for any crime committed in Union County, and that for the 15½ year period from January 1, 1949, through June 30, 1964, 30 whites and 24 Negroes received life sentences for rape. This 5–4 ratio, wholly apart from the facts of the particular cases, is certainly not persuasive evidence of discrimination in application. It is even less so for the decade 1955–64, inclusive; for that period, 14 whites and 16 Negroes received the life sentence. Retained counsel would add

---

2. The Arkansas Constitution, Art. 2, § 3, also reads:

"The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity, nor exempted from any burden or duty, on account of race, color or previous condition."

3. The Arkansas Constitution, Art. 2, § 9, also reads:

"Excessive bail shall not be required, nor shall excessive fines be imposed; nor shall cruel or unusual punishment be inflicted * * *."

14 other cases,[4] where race of the defendants is said not to be apparent from the opinions, on the ground that these defendants "were obviously white persons" because of the "custom and practice in Arkansas" of always mentioning race if the defendant is a Negro. The five most recent of these, however, all of which do concern white persons, are already included among the 54 cases specified. We are not free to accept so loose a premise as to the remaining nine in the absence of proof and, even if we were, the 39 to 24 resulting ratio of life prisoners of itself affords no convincing proof of discriminatory application.

■ In connection with the cruel and unusual punishment claim, we note in passing that the elderly victim here was not one, to use the language of the three dissenters in Rudolph v. Alabama, 375

U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963), whose life was not "endangered". This record shows the use of a knife and is clearly otherwise.

On these issues we also adhere to our holding in Maxwell. It is not necessary that we repeat here what we said at some length there.

### The rape confession

Mitchell confessed the rape on March 12 at a session with William T. Prewett, the prosecuting attorney, and O. E. Bishop, the sheriff. His court-appointed counsel, J. S. Thomas, was not then present. The confession, although oral, was recorded through dictating equipment and a microphone. This recording was introduced in evidence and heard at the state trial. We reproduce it in the margin.[5]

4. McLaughlin v. State, 117 Ark. 154, 174 S.W. 234 (1915); Zinn & Cheney v. State, 135 Ark. 342, 205 S.W. 704 (1918); Davis v. State, 155 Ark. 245, 244 S.W. 750 (1922); Brust v. State, 153 Ark. 348, 240 S.W. 1079 (1922); Whittaker v. State, 171 Ark. 762, 286 S.W. 937 (1926); Houston v. State, 190 Ark. 1177, 79 S.W.2d 999 (1935); Gann v. State, 200 Ark. 947, 141 S.W.2d 834 (1940); Fields v. State, 203 Ark. 1046, 159 S.W.2d 745 (1942); Willis v. State, 212 Ark. 403, 206 S.W.2d 3 (1947); Batchelor v. State, 217 Ark. 340, 230 S.W.2d 23 (1950); Pemberton v. State, 221 Ark. 19, 251 S.W.2d 825 (1952); McDonald v. State, 225 Ark. 38, 279 S.W.2d 44 (1955); Stevens v. State, 231 Ark. 734, 332 S.W.2d 482 (1960); Rogers v. State, 237 Ark. 437, 373 S.W.2d 705 (1963).

5. "Q. Lonnie, you gave me a statement yesterday and I understand this morning that you want to give me a new statement, is that correct?

"A. Yes, sir.

"Q. Do you still understand that you do not have to give any statement, and that anything you give is voluntarily of your own free will and accord?

"A. Yes, sir.

"Monday about 6:30 I come from Mrs. Porter's,—I walked over by the Star and looked at the picture and didn't want to see the picture and walked up to Tom Thumb and got a can of beer; then I left there, I went by Grady's job and stopped there and me and Grady got a pint of wine together. I bought it at Dancer's

place. Then me and Grady caught a ride out towards St. Louis,—we got off by the cycle shop and we drunk the wine, and me and Grady parted there. He went to Lonnie's and I went to Amos' and shot some pools. I left Amos' and come back to Lonnie's,—I had two cans of beer then I left there and walked over next door and Ruby Freeman, she was over there and I helped drink a half pint of whiskey and then she got some more and I helped drink some more. I had a half a pint. Then I left there,—she took me home on North College; I left and went home then I come back. I put on a overcoat and I returned back to Mrs. Murphy's house then I went to the door and couldn't get in to the door, then I went around to the side door and cut the screen and got in through the window and I walked upstairs and I saw Mrs. Murphy and I put a knife on her head and told her not to holler and she didn't. She was frightened. And I went with Mrs. Murphy, then from there I come back downstairs and I got her pocketbook where she told me she had left it and I ran out the back door.

"Q. Lonnie, when you say that you went with Mrs. Murphy do you mean that you had sexual intercourse with her?

"A. Yes, sir, I did.

"Q. Did you force her to do that or was that with her free will and consent?

"A. I forced her to do it.

"Q. What was the reason that you went to Mrs. Murphy's house? Did you go

The record contains other evidence of the crime than Mitchell's confession. But we recognize, of course, that "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession * * * and even though there is ample evidence aside from the confession to support the conviction." Jackson v. Denno, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964).

Judge Young flatly found that the confession was voluntarily and freely given. P. 500 of 232 F.Supp. The defense, in opposition, argues that uncontradicted evidence in the record conclusively establishes that the confession was involuntary; that Mitchell did not waive this defense; that the confession is inadmissible anyway because the trial court did not effectively rule on the voluntary character of the confession before submitting it to the jury; and that it was also inadmissible because Mitchell had not conferred with counsel or been given appointed counsel on the rape charge by the time of the confession. The State strongly disagrees.

A. *The uncontradicted evidence.* The defense emphasizes ten factors. The first is that at the time of the crime Mitchell was a 23 year old Negro, was indigent, and was possessed of only a sixth grade education. Reference is made to the Supreme Court's natural concern for the "weak and illiterate", see Mr. Justice Douglas' concurring opinion in Culombe v. Connecticut, 367 U.S. 568, 641, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Fikes v. State of Alabama, 352 U.S. 191, 196–197, 77 S.Ct. 281, 1 L.Ed. 2d 246 (1957); and Blackburn v. State of Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242, footnote 7 (1960). The second is that Mitchell was arrested at an early hour and that a civilian who accompanied the arresting officers struck him. Mitchell testified, "There was five or six * * * There was about six or seven police officers out there. One guy, he wasn't a police officer. He's the one that hit me behind the head when they arrested me * * * He was some relation to the lady". The third is that there was brutality on the part of the arresting city police prior to Mitchell's transfer to the county jail. Mitchell testified that at the jail "they took all my clothes off * * * and handcuffed me behind. * * * And they took me in a little room downstairs and they began to beat me, one police officer and the desk sergeant and they was asking me about some robbery or something I didn't know anything about. * * * While one of them was beating me the desk sergeant caught hold of my privates". It is noted that a confession extorted by state officers' brutality violates the due process clause. Brown v. State of Mississippi, 297 U.S. 278, 279, 56 S.Ct. 461, 80 L.Ed. 682 (1936). The fourth is that after interrogation by the city police Mitchell was questioned by the assistant prosecuting attorney and required to "sign some papers". This point is evidently made to show continuous questioning by skilled persons, citing Ash-

---

there for the purpose of going with her or did you go there to steal money?

"A. I went there to steal money.

"Q. Last Friday I believe you worked for Mrs. Murphy and sometime during the afternoon you were left there by yourself,—did you at that time go inside the house and look the house over?

"A. No, sir, I didn't.

"Q. Where did you throw Mrs. Murphy's purse after you left her house Monday night?

"A. I went between the school and took the money out between the gym and the

school and I throwed the pocketbook on top of the school.

"Q. Lonnie, is this the truth and is this the things that you remember,—the statement that you have just finished giving me?

"A. It's the truth,—the whole truth.

"Q. Now, Lonnie, I'll ask you whether or not any promises or any threats or anything of any nature has been told you in order to get you a statement by me or anyone else?

"A. No, sir, it haven't."

craft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944). The fifth is that there is nothing in the record to indicate that, by the time this had occurred, Mitchell had been charged, taken before a magistrate, arraigned or offered an opportunity to post bail, all as required by Ark.Stat. §§ 43–601, –603, –605, –622, –1201, –1202, and –1203. It is said that Mitchell was thus detained under circumstances clearly in violation of Arkansas' own criminal code and that such a violation has been recognized by the Supreme Court in a number of cases as a factor in determining involuntariness. The sixth is that Mitchell was transferred to the county jail and held there for a night before being arraigned, and that when he was arraigned it was for robbery and not rape. The suggestion is that the State's only motive in so doing was to lend an air of legality to the detention and to have control over Mitchell during the investigation of the rape, citing Culombe v. Connecticut, supra; Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), and Mr. Justice Douglas' concurring opinion in United States v. Carignan, 342 U.S. 36, 46, 72 S.Ct. 97, 96 L.Ed. 48 (1951). The seventh is that Mitchell had not been visited by his parents. His father testified that he and the mother twice had tried unsuccessfully to see their son. It is said that holding a person incommunicado has been afforded significance by the Supreme Court in a multitude of cases, citing, among others, Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), and Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962). The eighth is that up to this point Mitchell still had not been taken before a magistrate or given an opportunity to post bond on the robbery charge or been arraigned on the rape charge. The ninth is that Mitchell had not consulted counsel on the rape charge and that counsel on this charge was appointed only at the arraignment thereon on March 16. The tenth is that the police had been investigating and gathering evidence which implicated Mitchell in the rape while all of this was occurring, that is, before the rape confession was obtained. Finally, the defense suggests that because the State went to great lengths to impeach Mitchell's testimony as to events while he was in the hands of county authorities, it is not understandable why there is no opposing testimony as to the preceding hours when he was in the hands of the city police. The asserted inference is that Mitchell's uncontradicted version of what happened before he was transferred to the county jail is necessarily correct.

We are not persuaded by this initial argument. There are too many opposing considerations for us to conclude that the "uncontradicted testimony" is clearly persuasive. We list a number of these, not necessarily in order of importance, but directed more or less seriatim to the defense's ten points: (1) There is of course no question about Mitchell's age and race. He was, however, an adult male and not a minor. He qualified, to the court's satisfaction, for an in forma pauperis proceeding but retained counsel did appear for him eventually and some fee on his behalf was paid. His parents were living, although separated. Mitchell was not a homeless and helpless waif. (2) We see nothing of significance in the time of the arrest. It was at night. Mitchell said it was between 11:30 and midnight. The State's witnesses fixed it around 3:00 a. m. Mitchell's statement relative to being struck by the civilian at the time of the arrest is both uncontradicted and uncorroborated. There is nothing about the force of the blow. Its occurrence, if it did occur, was unfortunate and improper although one may perhaps understand a relative's early and immediate anger. (3) The evidence as to brutality by the city police immediately after arrest is Mitchell's testimony alone. There is, however, testimony from the sheriff that, at the time of Mitchell's transfer from the city jail to the county jail at about 9:30 a. m. on the very morning of his arrest, there was no indication what-

soever of prior mistreatment of the prisoner and that Mitchell made no complaint to the sheriff. We note, too, that at the state trial one of the state officers, Lieutenant Thomas, answered, "He was not" in response to the cross-examination question, "You did not see him abused in any way?" This does not leave Mitchell's recital unattacked. (4) There is nothing in the record which indicates what the "papers" were that Mitchell signed or what significance they possessed. He stated that they were not a confession. (5) The reference to the several Arkansas statutes relating to arraignment and bail overlooks the fact that Mitchell concededly was out of city police hands by 9:30 in the morning following his nighttime arrest and that one may not expect, in a modest-sized midwestern city, the several described events to be preceded by access to a magistrate and arraignment when the judicial day has barely begun. The prosecuting attorney testified that he was in Little Rock that morning when he was informed of the crime and that he proceeded forthwith to El Dorado. (6) Although robbery is not a capital offense in Arkansas, Ark.Stat. §§ 41–3601 and –3602, it is a felony, § 41–103, and no misdemeanor or light crime. There was sufficient information in the hands of the prosecuting attorney to justify the lodging of the robbery charge and we cannot be critical of the State in that the prosecutor at that moment elected to charge only the lesser of the two felonies. This is not a mere premeditated holding action. The very shortness of time before the rape confession tends to deny manipulative intent on the part of the prosecution and, if the State's evidence as to Mitchell's volunteered expression of desire to speak of something further is believed, any inference is completely destroyed. (7) So far as the claim of Mitchell's being held incommunicado is concerned, one initially notes that the period was from the arrest until the robbery arraignment. This was but a little more than one full day. The father's testimony does not indicate what time of day it was when he and the mother went to visit their son or whether it was during established visiting hours. The father, being separated from the mother, was not present when Mitchell was arrested at the mother's home. There is testimony that when Mitchell was in jail people, including his lawyers, had the opportunity to talk with him. (8) Although Mitchell was never taken before a magistrate, in the justice of the peace sense, he was arraigned on the robbery charge before a state circuit judge on March 11, the day after the arrest. A plea of not guilty was entered for him and counsel was assigned to him. The record does not disclose any application for bail. (9) While counsel was not appointed specifically on the rape charge before March 16, Mr. Thomas was designated to defend this charge forthwith upon that arraignment. In the meantime, since March 12, he had been appointed as counsel for Mitchell on the robbery charge and, according to his testimony, had been in touch with Mitchell. The defendant was not without counsel in those intervening four days. (10) One would expect and hope that the investigation of the rape began immediately after it was reported. One would not necessarily expect that investigation to be complete within six days.

There are other factors, too, which are adverse to the defense claim on this initial point. First, there is positive, categorical, consistent denial of almost everything else which Mitchell said by way of excuse for his rape confession. This testimony came from nearly everyone who had anything to do with him. As an example, he said that when he was arraigned on the robbery charge the court did not tell him that he could have an attorney or that he did not have to make a statement, and, in fact, that the court never said a word to him of any sort. Judge Marlin, who conducted the arraignment proceeding, testified that he forthwith advised Mitchell that he should have an attorney; that when Mitchell said he did not have one, he appointed one for him; and that he in-

structed him to confer with his lawyer before he had anything to say and to make no statement apart from the presence of his attorney. Next, Mitchell testified that he made no confession on the robbery charge to Sheriff Bishop; that he did not see the sheriff when he was taken to the county jail; that he saw him first only two days later; that what the sheriff testified to did not take place; and that "I never made a statement to Sheriff Bishop". The sheriff in his testimony flatly denied this. He said that he advised Mitchell as to his rights and then Mitchell confessed to the robbery after about five minutes of questioning. And, perhaps most destructive, is the existence of the recording of this very robbery confession in Mitchell's own voice. Mitchell further testified that on March 12 he was in Prewett's office with both Prewett and the sheriff. "Sheriff Bishop caught my privates again and he told me either I would say it or he was going to kill me, so I had to say what they wanted me to say, under pressure * * * I wouldn't * * * until Sheriff Bishop caught me * * * so I agreed to say what he wanted me to say". The sheriff testified that on March 12 Sergeant Henley reported that Mitchell wanted to make another statement; that he was brought down to Prewett's office; that he was not physically abused in any way; that he did not touch him; that Mr. Thomas had talked to him between the two confessions; that Mitchell's parents were in the outer office when the rape confession was given; that when Mitchell came out his parents asked him if he committed this rape; and that he told them he did. Prewett testified that he took the rape statement; that prior thereto he told Mitchell that the rape was being investigated and a rape charge would be filed against him; that he explained his rights to Mitchell; that there was no manhandling of Mitchell at any time by him or by the sheriff. Mitchell's father testified that when he saw his son at the prosecutor's office "I seen some blood at the seat of his pants" but he did not have

to give him a change of clothing and did not ask Prewett about it; that he and his wife did not ask Mitchell if he had rape arraignment; that this was after committed the rape; but that he did hear his son say "yes" to the prosecutor in response to a question about the rape.

Mitchell also testified that he first saw his lawyer only at the second or the rape confession; that "I didn't see him any more" except at the trial; that Thomas never talked with him until the trial and never saw him in jail; that when the trial started he did not talk with him then; that in his life he had had only about three words with Mr. Thomas; and that Thomas never went over the confession with him. Mr. Thomas, on the other hand, testified that he went to the jail the day he was appointed and talked with Mitchell there about 20 or 30 minutes; that he conferred with him at least four times between the day of arraignment and the trial; that he was given free access to see Mitchell when he was in the county jail; that during the trial he talked with Mitchell and with his father; that he discussed each prospective juror with Mitchell; that Mitchell never mentioned abuse; that he inquired of Mitchell about any abuse but was told that there was none and that he had been well treated by the sheriff's office; that he discussed the confession with him and reviewed the questions and answers; and that he inquired about the possibility of an alibi. Zadie Richmond, a trusty, testified that he saw Thomas at the jail talking to Mitchell.

There is curious testimony about the summoning of a physician. Mitchell's father stated that he asked his doctor to see Mitchell in jail but that the doctor did not go to see him and he did not ask him again. Mitchell testified that he tried to call a doctor because he was in pain; that he had a trusty call his father to call the doctor; that a doctor did visit him at the jail but just talked with him and did not examine him; that he did not cry out when he was abused or tell his father or Mr. Thomas but did tell

his mother; and that he did not tell a lawyer about it until he reached the penitentiary.

These uniform and categorical denials of Mitchell's statements are for us not unimpressive. They come not only from the sheriff and the prosecuting attorney, who were accused by Mitchell of physical abuse, but, as well, from the arraigning judge, from Mitchell's appointed attorney, and from a Negro trusty. Everyone, so far as Mitchell was concerned, was apparently not telling the truth. This opposing testimony weakens for us such strength which any uncontradicted statements, such as they were, might otherwise have had. Uncontradicted testimony, particularly when it comes from an interested witness, need not be accepted as true by the factfinder when it is improbable or unreasonable. Quock Ting v. United States, 140 U.S. 417, 420–421, 11 S.Ct. 733, 35 L.Ed. 501 (1891); Banks v. Commissioner, 322 F.2d 530, 537 (8 Cir. 1963); Schoenberg v. Commissioner, 302 F.2d 416, 419 (8 Cir. 1962). Further, there must be some point beyond which the prosecution need not go to produce evidence to refute bald and otherwise unsupported and loose assertions. Finally, we have the impression, from a review of Mitchell's testimony, that it was not testimony of an illiterate, obtuse and helpless person. A reading of the confession itself seems to indicate its voluntariness. It contains no leading questions and gives the appearance of being a quietly told narrative of events.

Bearing in mind that close scrutiny of the facts of the individual case is the necessary approach, and that there "is no guide to the decision * * except the totality of circumstances", Gallegos v. State of Colorado, supra, pp. 52 and 55 of 370 U.S., p. 1213 of 82 S.Ct., we conclude, after such scrutiny and upon consideration of all the circumstances here, that what the defense asserts as uncontradicted testimony is not entirely so and, in any event, does not establish conclusively and as a matter of law that

Mitchell's rape conviction was involuntary. Jackson v. Denno, supra, footnote 20, p. 392 of 378 U.S., 84 S.Ct. 1774.

B. *Waiver of the coercion issue.* Fay v. Noia, supra, 372 U.S. 391, 438–440, 83 S.Ct. 822, 849 (1963), teaches us that there is "a limited discretion in the federal judge to deny relief" to a habeas corpus applicant for a procedural default; that one such circumstance is the deliberate bypassing of the orderly procedure of the state courts; that, however, "this grant of discretion is not to be interpreted as a permission to introduce legal fictions into federal habeas corpus"; that the controlling standard is the "intentional relinquishment or abandonment of a known right or privilege", as enunciated in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); that "the standard here put forth depends on the considered choice of the petitioner"; that a "choice made by counsel not participated in by the petitioner does not automatically bar relief"; that a state court's finding of waiver does not prevent the independent determination of the question by a federal court on habeas, "for waiver affecting federal rights is a federal question"; and that each case stands on its own facts.

The State argues, and the district court agreed, that Mitchell waived the right to attack his rape confession on coercion grounds and that he did so with all the Noia standards fulfilled. Specific reliance is placed on the facts that in a conference in chambers during the state trial, see footnote 6, infra, Mitchell's counsel stated that there was no contention that the confession was not made voluntarily, and Mitchell himself conceded that he had been well treated by the officers while in the county jail.

This statement from Mitchell, if true, is not consistent with testimony from him at the federal hearing with respect to the prosecutor and the sheriff. Also, what he then said related only to his county and not to his city incarceration.

█ In view of Mr. Thomas' testimony that he did inquire of Mitchell as to abuse and its possible usefulness in circumventing the confession, and was told there was none, and that he had reviewed the confession with Mitchell in detail, the question of waiver could be close. We note, for such significance as it possesses, the district court's apparently mistaken impression, pp. 499 and 501 of 232 F.Supp., that only in the federal habeas proceeding did Mitchell raise the issue; actually, however, coercion was suggested in the very first post-conviction proceeding. See p. 664 of 337 S.W.2d and p. 202 of 346 S.W.2d. This of itself may not be controlling. But, taking into consideration all the facts, the absence of a personal expression of waiver by Mitchell, and the tremendous stake so far as he is concerned, we are not at all convinced that the Supreme Court, on this record, would uphold the district court in its determination that Mitchell had waived the coercion issue. We have in mind here the "limited discretion" of the habeas court, the necessity for a deliberate by-passing, the Supreme Court's distaste for legal fictions in this area, the standard of intentional relinquishment of a known right, the necessity of a "considered choice" by the defendant himself, and the unacceptability of a choice claimed to be made only by counsel. We must, therefore, disagree with the district court's conclusion that Mitchell effectively waived the question of coercion and we pass on to the other aspects of this defense.

C. *The absence of consultation with counsel.* The defense argument here is that the rape confession was taken on March 12 but the rape arraignment was held four days later on March 16 and only then was counsel appointed to defend Mitchell on that charge. Reliance is placed on Mitchell's habeas testimony that he first saw Mr. Thomas only after the rape confession. Implications of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) are then suggested.

It must certainly be conceded that by the time of the rape confession the investigation had "begun to focus on" Mitchell, to use the language of Escobedo, p. 490 of 378 U.S., 84 S.Ct. 1758, as a particular suspect for the rape. He had been taken into custody. He had been formally charged with robbery. A plea had been entered for him and counsel had been appointed on that charge. There was nothing to indicate that the State was separating the robbery from the rape. And the prosecutor's testimony was to the effect that he had advised Mitchell, prior to the rape confession and, indeed, prior to the robbery confession, that a rape charge was being filed against him.

But these very facts also have their adverse aspects for the defense. Both robbery and rape were committed against one victim. According to the prosecutor's testimony Mitchell had been advised as to his constitutional rights and as to the rape charge. The circuit judge arraigning him on the robbery charge had advised him of his rights. And he then possessed an attorney in the person of Mr. Thomas who testified that he was in consultation with him and had free access to him. There is also testimony that Mitchell himself requested the interview. That session was short. The earlier confession as to the robbery, made under not dissimilar circumstances, was admitted in evidence and yet undergoes no attack on this appeal. All this amounts to a situation far different from the plight of Escobedo, whose repeated requests to see his lawyer were denied and who had not been advised of his rights. P. 491 of 378 U.S., 84 S.Ct. 1758. Further, we have heretofore noted that the Supreme Court has not yet established an absolute rule that a confession made without counsel violates Sixth Amendment rights under all circumstances. Hayes v. United States, 347 F.2d 668, 669–670 (8 Cir. 1965).

█ We therefore do not believe that the holding in Escobedo has a factual parallel or effective application here. If

Mitchell's rape confession was the product of coercion and hence was inadmissible, this will be due to other factors and other aspects and not to fundamental unfairness because of the absence of counsel at the confession. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Spano v. People of State of New York, 360 U. S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), which are cited to us, are clearly distinguishable, for the surreptitiousness in Massiah and the long and overbearing questioning in Spano are not present here.

D. *Judicial determination of voluntariness before submission of the confession to the jury.* Pertinent here, of course, is Jackson v. Denno, supra, 378 U.S. 368, 84 S.Ct. 1774 (1964), decided after Mitchell's state court trial and appeals. There the New York practice of submitting to a jury the contested issue of voluntariness of a confession was held, by a divided court, not to provide a means for a reliable determination of the question and to be violative of the due process clause of the Fourteenth Amendment. An earlier Supreme Court case to the contrary was overruled. It was further held, p. 394, 84 S.Ct. p. 1790 that a defendant is constitutionally entitled to "an adequate evidentiary hearing productive of reliable results concerning the voluntariness of his confession", and that this hearing is one for the state court, not the federal habeas corpus court. The defendant Jackson, however, was deemed not automatically entitled to a new trial; his case was remanded to allow the State a reasonable time to afford him either "a soundly conducted" collateral hearing on the issue of voluntariness or a new trial.

Mr. Justice Black, dissenting in part and concurring in part, appended to his separate opinion a summary of state and lower federal court decisions. Therein he classified Arkansas as one of the states which followed the New York procedure the Court was then invalidating. Cited were Monts v. State, 233 Ark. 816,

823, 349 S.W.2d 350, 355 (1961); Burton v. State, 204 Ark. 548, 550–551, 163 S.W.2d 160, 162 (1942); and McClellan v. State, 203 Ark. 386, 393–394, 156 S. W.2d 800, 803 (1941). These cases do indicate that Arkansas followed the New York practice. The State concedes this when in its brief it says, "under ordinary circumstances, it would be inconceivable that in this jurisdiction the decision of Denno or [its] requirements could have been foreseen and met". And Judge Young, in a later opinion, recognized that the Arkansas procedure, as such, "does not meet the constitutional requirements of due process as discussed in Denno". Trotter v. Stephens, 241 F.Supp. 33, 47 (E.D.Ark.1965), now on appeal to this court. He spoke again to the same effect in Stewart v. Stephens, 244 F.Supp. 982, 992–994 (E.D.Ark.1965). [Arkansas has now provided for a determination by the court of the voluntariness of a confession. Acts 1965, No. 489, § 1, approved March 20, 1965.]

The past existence of this Arkansas practice, however, does not necessarily mean that in Mitchell's case the evidentiary hearing requirement of Jackson v. Denno was not met. It still may have been. If it was, the vice at which Denno is directed is not present here and has not prejudiced Mitchell; and the fact that the court also permitted the trial jury to pass upon the issue of voluntariness occasioned no prejudice to him. Jackson v. Denno, supra, p. 394 of 378 U.S., 84 S.Ct. 1774. If it was not, then Mitchell, like Jackson, is entitled to an independent determination in the state court on the question of voluntariness of his rape confession, or, if the State chooses, to a new trial. Jackson v. Denno, supra, p. 395 of 378 U.S., 84 S.Ct. 1774; Boles v. Stevenson, 379 U. S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964).

In Mitchell's state court trial Sheriff Bishop, in his testimony, came to the point of the second or rape confession. An objection was raised. Thereupon, the

court, the lawyers, and Mitchell all retired to chambers. We set forth in the margin what the record in its entirety discloses as to the events in chambers.[6]

6. The Court:

Gentlemen, as I see this an objection has been made to the Sheriff testifying as to what the confession, if any, was. Is that your objection, Mr. Thomas?

Mr. Thomas:

Now that is that statement number two, there is no objection to statement number one.

Mr. Prewett:

I would like to have the counsel for the defendant to state into the record his reason for the objection.

Mr. Thomas:

Our objection is that it was secured before arraignment and before the appointment of counsel, which under the recent decisions of the United States Supreme Court makes that statement inadmissible.

Mr. Prewett:

I would like to ask counsel if he concedes here that this defendant had previously been arraigned on the robbery charge prior to the taking of this statement.

Mr. Thomas:

It is my contention that the robbery charge and the rape charge are separate and distinct charges,—in other words, you are trying to get us to concede that it was one transaction, and it is not.

Mr. Prewett:

Your objection is that he had not been arraigned on the charge of rape when he made the statement. I wish to state to the Court that I had advised the defendant that a charge of rape was pending and would be filed against him.

Mr. Thomas:

But he had not been arraigned on the charge of rape.

Mr. Prewett:

I would like to ask counsel if there is any contention here on part of the defense on this last statement that was taken in the office of the Prosecuting Attorney, is there any contention that it was not made voluntarily or with threats or coercion?

Mr. Thomas:

No.

The Court:

It is the defense contention that the statement is inadmissible because the defendant had not been arraigned on the charge of rape?

Mr. Thomas:

Yes, and that counsel had not been appointed—

The Court:

All right.

Mr. Thomas:

When the statement was given I did not know that I had been appointed as his counsel.

The Court:

I think that if the statement was given to the officers while he was in custody and if he was apprised of the charge pending against him, and that he voluntarily and without force and without promise and without hope of reward, made the statement of his own volition that the statement can be properly introduced.

Mr. Prewett:

While in chambers, in order that the Jury may have the benefit of exactly what was said to the officers we desire to play the dictaphone and the record to the Jury and would like to ask if the defense has any objection to the playing of the record?

Mr. Thomas:

Do you intend to play the record and also read the statement?

Mr. Prewett:

No, sir.

Mr. Prewett:

No objection is made to the first statement?

Mr. Thomas:

No, sir.

The Court:

No objection is made to statement number one, and he has the right to play the record.

Mr. Thomas:

The defendant has stated to me repeatedly that he has been accorded every kindness and every consideration at the hands of the county officers only.

Mr. Prewett:

With permission of the defense counsel, I would like to ask if the defendant personally made that statement.

Mr. Thomas: (to the defendant)—

Lonnie, you stated to me that you had been well treated by the officers while in the county jail?

The Defendant: (Lonnie B. Mitchell)—

Yes, sir.

The Court:

I am going to instruct the jury as follows:

You are instructed that a confession made by any defendant is never admissible unless the jury finds from the evidence that it was freely and voluntarily made by the defendant. If you should believe from the evidence in this case that the defend-

Upon the return to the court room the court stated to the jury that it was going to overrule the objection and instructed the jury that "it is within your province to determine whether or not this statement was voluntarily made". The court then gave the three paragraph instruction it had recited in chambers.

We observe again that defense counsel at the trial made no point of involuntariness in his objections. Indeed, he flatly stated that coercion was not an issue. This aspect was raised by the trial judge himself. But it was, in fact, raised and is, thus, clearly in the case. See Jackson v. Denno, supra, p. 374 of 378 U.S., 84 S.Ct. 1774. Judge Young passed upon it. We do the same.

Judge Young reviewed Jackson v. Denno and held that the state trial court's observation, "I think that if the statement was given to the officers while he was in custody and if he was apprised of the charge pending against him, and that he voluntarily and without force and without promise and without hope of reward, made the statement of his own volition that the statement can be properly introduced", constituted a full and independent resolution of the issue of voluntariness adverse to the defendant.

This could, indeed, be so. We might, with good reason, repeat and emphasize that no evidence as to involuntariness is present in the record of the state court trial; that Mitchell was given a private hearing in chambers and a clear opportunity to present his claim of duress if he had one; that no such claim was then asserted; that defense counsel even made a specific and positive statement to the court that there was no contention

that the rape confession was involuntary; that giving the instructions to the jury was routine in Arkansas and not otherwise significant; that there was no evidentiary basis for an independent determination of voluntariness; that in any event what the court did was equivalent in substance to a Denno hearing; and that the Denno issue, on this record, is only an afterthought.

Because of all this, we are almost persuaded that Denno has no application here and that, if it has, its requirement has been met. However, in the light of facts, as they are now asserted and disputed at this late hour, we are not so completely satisfied about the fulfillment of Denno's standards that we possess, to a realistic certainty, a sense of sureness as to the Supreme Court's attitude. This is, after all, a case of ultimate consequence to Mitchell.

■ We have the impression that what the state trial court intended to do, and was doing, was to be particularly careful to protect Mitchell's constitutional rights, as then understood, to the extent of being sure that the issue of voluntariness of the confession was not lost by default or, with any doubt present, was submitted to the jury in accord with the Arkansas Supreme Court decisions which have been cited. What the trial court did was appropriate under the law as it had then been enunciated. But Jackson v. Denno has now been decided and there is no serious question relative to retrospective application. Linkletter v. Walker, 381 U.S. 618, 638–639, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). If an independent state determination of the issue of voluntariness has not been made

---

ant made a confession but that it was obtained by threats or promises of reward, force or intimidation, it is not to be considered by you for any purpose.

The Court instructs you further in this respect that the burden rests upon the State to establish by evidence that such confession was freely and voluntarily made.

In the event you should find from the evidence in this case that the defendant did make a confession and you should

further find that it was freely and voluntarily made by him without force, threats or intimidation used upon or toward him, without any hope of reward or any promises of reward you may consider such confession together with the other evidence in the case giving it such value as you may find it to be entitled to from the evidence in the case.

Mr. Thomas:

SAVE OUR EXCEPTIONS.

by the judge or by a jury distinct from the trial jury itself, see footnote 19 in Jackson v. Denno, supra, p. 391 of 378 U.S., 84 S.Ct. 1774, then Mitchell is entitled at least to his hearing. Because of a mild doubt on our part, we remand. The eventual result may or may not be the same. But all will then know that the rule of Denno will have been satisfied and that Mitchell's constitutional rights will have been clearly protected.

In summary, therefore, on the confession point, we hold that this record does not establish involuntariness as a matter of law or that Mitchell effectively waived the issue of coercion; that the district court's determination that the defense claim as to the absence of assistance of counsel has no substance is adequately supported by the record; but that, under Jackson v. Denno, Mitchell is entitled to an independent state court determination as to the voluntariness of his confession.

### Effective assistance of counsel

The argument before us on this Sixth-Fourteenth Amendment feature of the case is now specifically directed to the effectiveness of Mr. Thomas' representation of Mitchell. Judge Young, 232 F. Supp. p. 509, in general terms, concluded "that he had effective assistance of counsel throughout the state court proceedings." The defense urges otherwise and cites Powell v. State of Alabama, 287 U.S. 45, 57, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932), with its reference to "the aid of counsel in [a] real sense", and Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). It specifically stresses that (a) Mr. Thomas, although advised of circumstances indicating coercion, failed to object to the confession on that basis; (b) he failed to raise the insanity defense and to have Mitchell examined prior to trial; (c) he failed to request a continuance, to move for a change of venue, and to object to the prosecutor's closing argument; and that (d) there is testimony that he did not adequately consult with Mitchell before the trial.

It is always difficult, of course, for an appellate court subsequently to evaluate the effectiveness of counsel in preparation for and at the trial. This is a peculiarly sensitive task when the attorney whose actions are now criticized was court-appointed and devoted time and talent gratuitously to the defendant. So much depends on judgment and on the factors which influence judgment at the moment. Effective assistance does not equate with success. Taylor v. United States, 332 F.2d 918, 922 (8 Cir. 1964); Kilgore v. United States, 323 F.2d 369, 372–373 (8 Cir. 1963), cert. denied 376 U.S. 922, 84 S.Ct. 681, 11 L.Ed.2d 617. On the other hand, the fact that counsel is court-appointed does not entitle him to render sham or less than effective assistance and thus to deny the defendant that which the Sixth and Fourteenth Amendments guarantee. Pineda v. Bailey, 340 F.2d 162, 164–165 (5 Cir. 1965); Nutt v. United States, 335 F.2d 817, 818 (10 Cir. 1964), cert denied 379 U.S. 909, 85 S.Ct. 203, 13 L.Ed.2d 180.

Mr. Thomas was an experienced lawyer and was not a newcomer to the bar. He was over 60 years of age at the time of the trial. He testified that he was admitted to the Arkansas Bar in July 1927; that most of his practice was in the locality of the trial and was general in nature; that he had represented other defendants charged with capital crimes and many persons charged with lesser crimes; and that he had served as a city attorney and as a municipal judge in El Dorado. Upon reviewing the state court record we conclude that his examination of witnesses was conducted according to accepted standards and with pertinency. This brings us back, then, to the judgment decisions of not raising the issues of coercion and insanity, of not pursuing certain procedural steps, and of not having more consultations with Mitchell.

It is to be observed again that as to some of these facets there is sharp conflict in the evidence. Thomas and others testified of free access to Mitchell and of frequent consultations. It is true that the coercion issue was not raised and its

existence was even specifically denied by counsel during the trial. But if Mr. Thomas' testimony is to be accepted, this was a matter of definite and deep concern to him. He reviewed it with Mitchell, but he was given no material with which to work. In any event, it is before the court now and Mitchell, as we have held above, is to have his day in court on this claim and must then make his case if he can. The insanity point with which we deal below is, even with new counsel, relegated to the existing record. Mr. Thomas also testified that he suggested a plea of insanity to Mitchell but Mitchell did not desire it. He said the same as to an alibi, possible witnesses and a continuance. He recommended the employment of Wiley Branton, a capable Negro attorney, as co-counsel for the trial. He had Mitchell's father at the table with him during the trial and conferred with him.

With all this, we could not hold that Mr. Thomas did not render Lonnie Mitchell the full measure of his devotion as defense counsel in the light of such information and such facts as Mitchell gave him. He presented no witnesses other than Mitchell's parents because, as he testified, "We just didn't have any witnesses". And the parents readily testified that their son, on the night in question, was drunk.

██ It therefore appears to us that Mitchell was provided with able counsel; that counsel competently represented him; and that his Sixth and Fourteenth Amendment right to have the assistance of counsel has not been denied. See Kilgore v. United States, supra, pp. 371–373 of 323 F.2d, and Johnson v. United States, 333 F.2d 371, 373 (10 Cir. 1964).

### Sanity

As has been noted, the defense of insanity was not raised at the state court trial or on the appeal from the conviction. It was suggested in the motion to vacate the state judgment, see p. 664 of 337 S.W.2d, and in the state habeas corpus proceeding, see p. 202 of 346 S.W.2d. It was the basis of the application for a writ of error coram nobis to the Arkansas Supreme Court. Mitchell v. State, supra, 234 Ark. 762, 354 S.W.2d 557 (1962). That court observed, p. 559, that the report of a private psychiatrist, selected by the defense, based upon two examinations of Mitchell in January 1960, was to the effect "that he is competent and knows right from wrong", that the report contained nothing indicating insanity at any time, and that a 1960 report from the staff of the Arkansas State Hospital was to the effect that Mitchell was "without psychosis". Nothing more was presented to the court. It necessarily concluded, p. 560, that "there is absolutely no evidence to support the allegations made in the application".

Although on our remand, see p. 19 of 332 F.2d, we went out of our way to leave the insanity point open "to allow appellant to present such evidence as he may have, if any, upon the question", the defense presented nothing more. Retained counsel states that one must "doubt the rationality of any virile 23-year old male that would rape a 77-year-old arthritic woman regardless of the race of the parties involved. This attitude takes on more compelling force when the parties are of the opposite races living in a small conventional southern community". But counsel also states that he was not able to produce additional evidence and therefore "permitted the matter to be closed on the basis of the evidence that is now a part of the various records". The appellee presented state hospital staff reports of January 5, 1960, and February 1, 1962, both of which recited that Mitchell was "without psychosis" and "not now mentally ill, to the degree of legal irresponsibility". Upon this state of the record we can conclude only that the defense of insanity at the time of the commission of the crime or at the time of trial possesses no compelling significance in the case.

We are profoundly grateful to former Governor Sidney S. McMath and to John P. Sizemore of the Little Rock Bar for their efforts as court-appointed counsel for Mitchell on this appeal. It appears to

us that no defensive element in the case has been overlooked and that Mitchell has indeed been well represented here by his retained counsel and by his court-appointed counsel.

The order of the district court dismissing the petition for a writ of habeas corpus is reversed and the case is remanded with directions to grant the State of Arkansas a reasonable time to afford Mitchell an appropriate hearing on the issue of voluntariness of his rape confession or, in the alternative, a new trial.