## DAVIS v. STATE.

### Opinion delivered October 16, 1922.

1. CRIMINAL LAW—CHANGE OF VENUE—AFFIDAVITS OF CREDIBLE PERSONS.—Where supporting affidavits to a motion for change of venue in a criminal case showed that affiants had no general acquaintance throughout the county and had not visited a large proportion of the townships, and their opinion that defendant could not get a fair trial in the county was based on the fact that a crowd of citizens from the county seat and from prosecutrix's neighborhood gathered at the examining trial, and affiants were told they were waiting to get hold of defendant to lynch him, there was no abuse of discretion in holding that the petition was not supported by affidavits of two credible persons, as required by Crawford & Moses' Dig., § 3088.

2. CRIMINAL LAW—CHANGE OF VENUE.—In a prosecution for rape, the fact that 138 jurors out of 173 summoned had formed an opinion as to the guilt of defendants did not show that they could not obtain a fair trial, defendants not having exhausted their peremptory challenges.

3. CRIMINAL LAW—CONTINUANCE—ABSENT WITNESS.—It was not error to refuse a continuance in a criminal case on account of the absence of a witness where the application failed to state that the witness was not absent by connivance of defendants and where no showing was made that the witness' attendance could be secured at a subsequent term, and where such witness' testimony would have contradicted the testimony of one of the defendants.

4. CRIMINAL LAW—PROSECUTOR'S REMARKS—REMOVAL OF PREJUDICE.—In a prosecution for rape, any prejudicial effect of the prosecutor's remarks in his opening statement that "it was regrettable that cases of this kind must be brought before the bar of

justice, and that the people are to be commended for their good behavior in the matter," etc., was cured by an instruction to the jury to disregard the remarks.

5. CRIMINAL LAW—OMISSION OF JUDGE TO READ INSTRUCTIONS.— Under Crawford & Moses' Dig., § 3179, providing that, when the evidence is concluded, the court shall, on motion of either party, instruct the jury on the law applicable to the case, *held* that where the instructions were read to the jury by the attorneys, instead of by the judge himself, this method of submitting the instructions did not deny the defendants any rights nor operate to their prejudice.

6. CRIMINAL LAW—PROSECUTOR READING INSTRUCTIONS.—A contention that there was error in permitting the prosecuting attorney to read the State's instructions, instead of the judge doing so, will not be considered where no objection was made thereto in the trial court, though such practice is not to be commended.

7. CRIMINAL LAW—RAPE—REDUCTION OF PUNISHMENT.—Where, under the facts in a rape case, punishment by death was excessive, the Supreme Court has power to reduce the punishment to life imprisonment.

8. RAPE—REDUCTION OF PUNISHMENT.—Evidence in a rape case *held* to justify reduction of the punishment from death to life imprisonment.

Appeal from Union Circuit Court; *C. W. Smith,* Judge; affirmed.

*Isgrig & Dillon,* for appellants.

*J. S. Utley,* Attorney General; *Elbert Godwin* and *W. T. Hammock,* Assistants, for appellee.

HART, J. John Davis and C. F. Johnson were separately indicted for the crime of rape, and by consent were tried together.

The testimony for the State shows that John Davis and C. F. Johnson each committed the crime of rape upon the person of Ruthy Goley, a girl fifteen years old, in Union County, Arkansas, during the first part of June, 1922. The defendant, Davis, admitted having sexual intercourse with Ruthy Goley, but said that it was done with her consent. Johnson denied having had intercourse with her at all.

The jury found the defendant, John Davis, guilty of rape on the person of Ruthy Goley as charged in the in-

dictment. The jury found the defendant, C. F. Johnson, guilty of carnal abuse on the person of Ruthy Goley, and assessed his punishment at five years in the State Penitentiary.

From the judgment and sentence of conviction each defendant has duly prosecuted an appeal to this court.

Counsel for the defendants do not claim that the evidence for the State is not sufficient to warrant the verdict. Hence we do not deem it necessary to abstract the evidence adduced at the trial, and need only say that the testimony of Ruthy Goley, if believed by the jury, supports the verdict returned in each case.

The first assignment of error relied upon for a reversal of the judgment is that the court erred in refusing to grant the motion of the defendants for a change of venue.

Dr. W. L. Miles was one of the supporting witnesses to the petition of each of the defendants. Assuming that he was a credible witness within the meaning of the statute, still the court did not abuse its discretion in refusing to grant the motion, because it cannot be said as a matter of law under the evidence disclosed by the record that the other affiant in either case was a credible person under the statute.

Sec. 3088 of Crawford & Moses' Digest requires that a petition for a change of venue should be supported by the affidavit of two credible persons.

W. W. Wagner was one of the supporting affiants. On his examination before the court he stated that he was in charge of a transfer company located at El Dorado, the county seat of Union County, and that his duties seldom required him to go outside of the city. He had not been outside the city since the defendants were accused of committing the crime in question, except to go to the oil wells near the city. On one occasion he saw a crowd near the courthouse and was informed that it was waiting to get hold of the defendants to lynch them. He did not know where the crowd came from, but thought that

they were from the town of El Dorado and from the neighborhood where Ruthy Goley lived. He had never heard any one say that Davis and Johnson could not get a fair and impartial trial in Union County. He based his opinion that they could not get such a trial on what he saw at the courthouse and what he heard in a barber shop in the city of El Dorado.

C. M. Barker was a remaining affiant. According to his testimony, he had come from Little Rock to El Dorado about a year before the crime in question was charged to have been committed. He made an affidavit that Johnson could not get a fair trial in Union County, and based his opinion on what he heard people say at his drugstore in the city of El Dorado. He did not recall whether he had heard any particular person say that Johnson could not get a fair trial in Union County. His opinion was based upon what he heard from the mob. He was asked if he knew what the people in the various outlying townships in the county thought about the case, and he said that he knew nothing about it.

The examination of these two supporting affiants showed that they had no general acquaintance throughout the county and had not visited a large proportion of the townships of the county. They had heard no expression of the general sentiment of the electors, and their information was of a local character. They based their opinion upon the formation of a mob composed of the citizens of the city of El Dorado and of the neighborhood where the prosecuting witness lived, which had gathered at the courthouse while the examining trial of the defendants was being held. Therefore, the court did not abuse its discretion in holding that two credible persons had not signed the petitions for a change of venue. as required by the statute. *Dewein* v. *State,* 120 Ark. 302; *Ware* v. *State,* 146 Ark. 321, and *Avey* v. *State,* 149 Ark. 642.

Counsel for defendants also urge that the petition for a change of venue should have been granted because

138 jurors out of 173 jurors summoned were excused because they had formed an opinion in the case of the guilt of the defendants. This fact did not show that the defendants could not obtain a fair trial in a large and populous county like Union County. Indeed it is rebutted by the fact that a jury was selected out of a venire of two hundred electors; and the defendants did not exhaust the peremptory challenges allowed them under the statute.

The next assignment of error is that the court erred in refusing to grant the motion of the defendants for a continuance. The motion sets up that the defendants could show by a man named Harris that, if he were present, he would testify that he was present in the room where the prosecuting witness states that Davis and Johnson committed the rape upon her, and that neither of the defendants had sexual intercourse with her at all.

In the first place, it may be stated that the testimony of this witness, if given before the jury, as set out in the motion for a continuance, would have been directly contrary to the testimony given by the defendant, Davis. Davis admitted having voluntary sexual intercourse with the prosecuting witness at Johnson's rooming house, and stated that no one else was in the room when it occurred. Besides this, the motion failed to state that the witness was not absent by the consent, connivance, or procurement of the party asking for the postponement, as required by sec. 1270 of Crawford & Moses' Digest.

Again, no showing was made that the attendance of the absent witness could be procured at a subsequent term of the court. Hence the denial of the motion was not an abuse of discretion by the court. *Davis* v. *State*, 95 Ark. 555, and *Owens* v. *State,* 120 Ark. 562.

It is next insisted that the judgment should be reversed because the circuit court did not instruct the jury that, if it found the defendants guilty of the crime of rape, it might assess their punishment at death or life imprisonment in the penitentiary, as provided in § 3206 of Crawford & Moses' Digest.

The record shows that the court expressly told the jury that, if it found the defendants guilty of rape, it might assess their punishment at death or life imprisonment in the State Penitentiary. Therefore, this assignment of error is not well taken.

The next assignment of error is that the prosecuting attorney was permitted to make certain prejudicial remarks in his opening statement of the case to the jury. The record on this assignment of error is as follows:

"'It is indeed regrettable that cases of this kind must be brought before our bar of justice.'

"'The people of El Dorado and Union County are to be commended for their good behavior in this matter.'

"'It is true that three or four hundred men assembled here on the day set for the examining trial.'

"The defense objected to each of the above remarks as being prejudicial to the cause of the defendants, and the court instructed the jury to disregard them."

It will be noted that the court instructed the jury to disregard the remarks made by the prosecuting attorney, and this, we think, had the effect to cure any prejudice that might have resulted to the defendants from the remarks. *Walker* v. *State,* 138 Ark. 517; *Sims* v. *State,* 131 Ark. 185, and *Williams* v. *State,* 131 Ark. 269.

The next assignment of error is that the judgment should be reversed because the court did not read the instructions to the jury.

The record shows that the court itself did not read the instructions to the jury, but permitted them to be read and argued by the prosecuting attorney and by the attorneys for the defendants.

Sec. 3179 of the Digest provides that when the evidence is concluded the court shall, on motion of either party, instruct the jury on the law applicable to the case. This is a part of our statutes regulating the procedure in criminal cases, and we have no provision requiring the presiding judge to read his charge to the jury.

The record affirmatively shows that the attorneys for the defendants were allowed to read and argue to the

jury the instructions prepared by themselves in the case. The record further shows that these instructions were given. The omission of the presiding judge to himself read the instructions to the jury merely affected the method pursued and did not deny the defendants any rights under the statute or operate to their prejudice.

The record shows that the defendants saved exceptions to the State's instructions Nos. 1 to 4. The record also shows that these instructions were not read to the jury by the court but were read to it by the prosecuting attorney. It does not show, however, that any objection was made by the defendants to this course. Hence this assignment of error is not well taken. *Wells* v. *State*, 151 Ark. 221.

While no prejudice resulted to the defendants in this case, the practice is one which should not be resorted to except by reason of some physical disability of the presiding judge, and then he should direct the clerk to read them to the jury as the instructions of the court. The instructions are statements of the law applicable to the facts, and are given for the guidance of the jury in considering the testimony. Hence they should proceed directly from the presiding judge.

The instructions given by the court fully and fairly submitted to the jury the respective theories of the State and of the defendants. Indeed, no complaint is made about the instructions by counsel for the defendants, except as already discussed.

We find no reversible error in the record, and the judgment in each case will be affirmed.

HART, J., (on rehearing). Upon a reconsideration of the case, we are of the opinion that, taking all the circumstances together, the sentence of punishment by death is excessive, and that we have the power to reduce it to life imprisonment.

This court has held that in prosecutions for homicide the finding of the jury as to the grade of the offense must stand, unless it is wholly without evidence to sustain

it, but where the punishment assessed by the jury is excessive, this court will reduce it. Whether the punishment is or is not excessive is to be determined upon a consideration of all the facts and circumstances of the particular case. *Petty* v. *State,* 76 Ark. 515, and *Childs* v. *State,* 98 Ark. 430.

This brings us to a determination of the question of applying this rule to cases of rape. In this State rape is defined to be the carnal knowledge of a female forcibly and against her will. Crawford & Moses' Digest, § 2714. The statute also provides that any person convicted of the crime of rape shall suffer the punishment of death. Crawford & Moses' Digest, § 2719. A subsequent statute provides that the jury shall have the right, in all cases where the punishment is now death by law, to render a verdict of life imprisonment in the State Penitentiary at hard labor. Crawford & Moses' Digest, § 3206.

In construing this latter statute in *Walker* v. *State,* 137 Ark. 402, the court referred to the jury fixing the punishment in a capital case at life imprisonment as imposing the lesser penalty provided by the statute. This indicates that the court regarded the statute as fixing a lesser and greater punishment in capital cases just as, in cases of murder in the second degree, the punishment is fixed at a period of not less than five nor more than twenty-one years (§ 2353), and in carnal abuse the punishment is fixed by statute at imprisonment for a period of not less than one year nor more than twenty-one years (§ 2720).

Again, in *Burns* v. *State,* 154 Ark. 215, it was held that the finding as to the punishment in capital cases was a part of the verdict, and that the statute gave the jury, and not the trial court, the power to fix the punishment at life imprisonment.

The Legislature in providing a greater and lesser punishment in capital cases evidently had in mind that, although the technical guilt of the accused might be established, there might be extenuating circumstances, such

as the extreme youth of the defendants or other matters, as in the present case.    Thus it will be seen that in capital cases the jury may now fix the punishment at death or by life imprisonment in the State Penitentiary at hard labor.    The effect of the two sections, when considered together, fixes a greater and lesser punishment for all capital cases, and therefore brings this case within the rule announced above.

This brings us to a consideration of the facts. Ruthie Goley, the prosecuting witness, was fifteen years old on the 22nd day of March, 1922, and lived with her parents in Union County, Ark., at the time of the perpetration of the crime there on June 1, 1922.    According to her testimony, Ruthie Goley first met the defendant at her father's house on May 31, 1922.    He came in a car with Shorty Miller, who came to tell Mr. Goley about his mule colt.    The defendant went to the cow pen with Ruthie Goley in company with her little brother, and they stayed there about thirty minutes.    The next afternoon Ruthie Goley went with her little brother to carry some eggs to a neighbor in the country, and met the defendant on the road about a half mile from her father's house.    Davis asked them to get in and ride with him. When they arrived at the neighbor's house, Davis told her brother to get out and carry the eggs in.    When her brother got out of the car, Davis started the car down the road.    Ruthie Goley asked him to stop and let her get out.    He told her he would not do it, and said that if she hollered he would blow her heart out.    Davis had a gun on him.    There was a negro named Grant in the car. Davis drove down the road to a big gate which Grant opened for him to drive in.    Davis asked Grant for a room, and Ruthie Goley refused to go in with him, and grabbed hold of a post on the porch.    Davis told the negro to hang a quilt on the porch post so that he could make her go into the house.    He then made her go into the house, and told her to get on the bed.    She refused, and Davis got hold of her and put her on the bed.    He fastened

her feet between the springs and the foot of the bed and put his hand over her mouth. He told her that if she did not lie still he would shoot her head off. Davis then had sexual intercourse with Ruthie Goley. She had never had sexual intercourse with any other man. They stayed at the negro's house about twenty minutes, and then went to Johnson's rooming house. She begged Davis to take her home, but he kept her in the rooming house and had sexual intercourse with her, against her will, several times. That night the defendant, the prosecuting witness, and Johnson drove up the public road a piece. The next night Davis and Johnson took her to a burning gas well in the neighborhood. Davis and Johnson kept her for more than two days, and both had sexual intercourse with her against her will. The night they went to the burning well they passed lots of people, but the prosecuting witness made no outcry. The mother of the prosecuting witness admitted that her young son came back and brought her the information that the defendant had carried his sister away in the car. When Davis was arrested, he did not have any pistol on him.

Mary Jane Grant testified that she did not hang any quilt on the porch at her father's house to enable the defendant to force the prosecuting witness to go into the house with him. She testified that Davis came into the house and asked for a room. Davis then called the girl, and she came of her own accord from the car, which was about 100 yards from the house. She voluntarily went with the defendant into the room, and they stayed there for about thirty minutes.

Johnson, the proprietor of the rooming house at which the defendant kept the prosecuting witness, denied having had intercourse with her at all. The defendant was forty-two years old, and has been married three times. He admitted having sexual intercourse with Ruthie Goley, but stated that it was with her consent. He wanted to take her back home after they left the negro's home, but she refused to go. He then carried

her to Johnson's house and kept her there for two days and nights. The defendant also stated that he made arrangements with Ruthie Goley at the cow pen at her father's house to meet him down the road the next afternoon. Both Ruthie Goley and her little brother denied that she did this.

The testimony of Ruthie Goley warranted the jury in finding the defendant guilty of rape, and, under the rule announced above, this court can not set aside the finding of the jury as to the grade of the offense. But, taking the surrounding circumstances into consideration, we are convinced that this is not an aggravated case of rape. After the prosecuting witness was carried to Johnson's rooming house she admits that she went out riding with them to a burning gas well and passed lots of people on the way, yet she made no outcry. They stopped the automobile in front of a store, and Davis was absent in the store for a half of an hour. The prosecuting witness sat in the car with Johnson and made no outcry there. She also admitted that they passed people on the first day while Davis was carrying her down the road to the negro's house, and she made no outcry. She gives as an excuse that she was afraid to cry out because the defendant had a pistol. The defendant had no pistol at the time he was arrested. Her young brother reported the fact to his mother that his sister had gone off with Davis.

These circumstances all tend to show that the prosecuting witness was not entirely the innocent victim of brute force. When her youth is considered in connection with the mature age of the defendant, and the fact that our statute makes it unlawful to have sexual intercourse with a girl of her age, it is clear that the defendant should receive a severe punishment, but, taking all the circumstances together, we are of the opinion that a sentence of death is excessive, and that we have the power, under the statute, to reduce the punishment to

life imprisonment in the State Penitentiary at hard labor, which is accordingly done.

. With that modification, the judgment will be affirmed.

McCULLOCH, C. J., (dissenting). The power of this court to reduce the punishment in a criminal case, when found to be excessive under the evidence, is undoubted. The power to impose life imprisonment instead of death on conviction of murder in the first degree or rape is, however, conferred solely on the trial jury. It is not a question of sufficiency of the evidence, but wholly an act of clemency in imposing the lighter punishment, and where the jury imposes the maximum punishment of death we cannot reduce the punishment if the evidence sustains the conviction. Clemency is not a judicial function. It is exercised, after conviction, by the chief executive.

There are no degrees in the crime of rape, and there can be no mitigating circumstances. If the act is done forcibly and against the will of the injured female, nothing can mitigate the enormity of the offense.

I fail to discover in the present case any mitigating circumstances. The fact that the injured female failed to make outcry when she should have done so, or would have been expected to do so, tends to show that the intercourse was not against her will, but the jury found, upon sufficient evidence, that she did not consent, and that fact did not lessen the enormity of the offense.

I think that the question of clemency should be left to the judgment and discretion of the Chief Executive where the power is lodged by the Constitution.

Mr. Justice HUMPHREYS joins in this dissent.