THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HORACE NELSON LAWS, DEFENDANT-APPELLANT. THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN WASHINGTON, DEFENDANT-APPELLANT.

Argued May 23, 1967—Decided September 25, 1967.

162

*Mr. Charles L. Bertini* argued the cause for appellant Horace Nelson Laws.

*Mr. Gerald E. Monaghan* argued the cause for appellant John Washington.

*Messrs. Richard F. Aronsohn* and *Thomas J. Gallahue, Jr.,* Special Assistant Prosecutors, argued the cause for respondent State of New Jersey (*Mr. Guy W. Calissi,* Bergen County Prosecutor, attorney).

The opinion of the court was delivered by

JACOBS, J. The defendants Laws and Washington were indicted, along with others, for conspiring to commit armed robbery and for murder. They were convicted of murder in the first degree and were sentenced to death. They were also convicted on the conspiracy charge but sentence on that was suspended. They appealed to this Court as of right under *R. R.* 1:2–1(c).

During the early morning hours of April 26, 1965 there was an armed robbery at the Public Service Coordinated

Transport's terminal garage in Oradell. Christopher Jaeger, a Public Service bus driver, was killed by pellets from a shotgun fired by one of the robbers. The State's evidence as to the robbery was quite detailed but need only be summarized here. At about 3 A. M. three men entered the Oradell terminal. They wore ski masks which covered their heads and had openings for their eyes and mouths. They also wore flesh-colored surgeons' gloves. Two of the men were short and the third was tall. The short men carried revolvers and the tall man carried a shotgun. The tall man did most of the limited amount of talking. He spoke with a southern drawl and, while there had been earlier variations in their descriptions, the witnesses at the trial generally agreed that he was brown or dark complexioned. The short men were invariably described as Negroes.

The robbers herded several of the Public Service employees into the cashier's office. There they handcuffed Ellis, a maintenance man, Elliot and Griener, bus drivers, and Jacobus, a bus driver who had been temporarily assigned by Public Service to duties as cashier and depot master. The employees were forced by the robbers to lie side by side on the floor of the cashier's office and their mouths and eyes were covered with white adhesive tape. The robbers then proceeded to empty the safe in the cashier's office. The safe had been open and had contained between 20 and 25 bags of money. After the robbers left the cashier's office, the employees heard a loud bang and then heard an automobile starting up and driving off. It sounded to them like a "souped-up car or a hot rod."

The handcuffed employees managed to push a button which sounded an alarm in other portions of the terminal garage. In response, Quinones, a Public Service mechanic, ran in. He announced that Jaeger had been shot and asked that the police and an ambulance be called. In due time the police arrived and found Jaeger's body lying in the garage. A doctor connected with the Bergen County Medical Examiner's office also arrived and ordered the body

removed. He performed an autopsy which disclosed that shotgun pellets and wadding had entered the brain. Although the exact amount taken by the robbers was not known at the time of the event, later investigation established that they had stolen $20,512.60. Of that amount approximately $10,000 was in single dollar bills, $2,000 in bills of higher denominations, and the rest in coins except for about $1,000 in checks.

During the early evening hours of April 26th, one Dennis Kingsley was at the Spring Valley, New York, station house talking to Chief of Police Kraniac. Dennis was asked about a burglary at Gattuso's Service Station in Spring Valley and Dennis gave some indication that it had been perpetrated by his older brother Joseph Kingsley and one Peter Kostas. Dennis first inquired whether there had been a big robbery in Bergen County, New Jersey, and later told Chief Kraniac that he knew about its planning. The Bergen County Prosecutor's office was called and shortly thereafter Dennis accompanied two representatives of the prosecutor's office to the Oradell police station. He made statements which were followed in New York by the issuance of search warrants and the search of several apartments including those of Laws and Washington. Thereafter the Bergen County Grand Jury returned separate murder indictments against Laws, Washington, Austin Baker, Joseph Kingsley, John Doe, and Richard Roe. A conspiracy indictment was returned against all of the aforementioned except Joseph Kingsley. Later the indictments setting forth the name of John Doe were amended to substitute the name of Julian Smalls in its stead.

At the trial, Dennis testified to the following effect: His brother had worked at the Oradell terminal and had told him that it would be "an easy place to knock off." About mid-April 1965 he and his brother were at the apartment of the defendant Laws who was known generally as "Hap". The defendant Washington was also there along with some other men. Dennis saw his brother and Hap leave the living

room to talk privately. On Sunday, April 18th, Dennis went to Laws' apartment looking for his brother. Laws told him that his brother had been arrested for "a safe job in Spring Valley." While Dennis was in the Laws' apartment, Washington and two other men came in. One of these men was Smalls. Smalls complained about his gun and Dennis offered to get a gun from his brother's hotel room. Laws then gave Washington the keys to his Plymouth automobile. Dennis, along with Washington and Smalls, went to the hotel but could not find the gun. They returned to the Laws' apartment and then Washington left for a few minutes and came back with an old single-barreled shotgun. Washington had five or six red and green shotgun shells.

Laws showed Washington how to load the shotgun, then went into the bedroom and brought out a green duffel bag. He opened the bag and took out three ski masks. Dennis described one as predominantly red with blue stitching. Dennis also saw Laws take out three pairs of flesh-colored surgeons' gloves. At that point Laws left the apartment saying that he was going to get Austin Baker's car. Laws returned to the apartment shortly and, about two in the morning of April 19th, Washington, Smalls and an unnamed person described by Dennis as a truck driver, left with Laws wishing them luck. At about 3:30 A. M., the telephone in Laws' apartment rang and Dennis heard Laws say that he was glad it happened on the way there and not on the way back. At about 4:30 A. M. the three men returned telling Laws that their car had gone dead.

There was independent testimony corroborating the breakdown of the car and the telephone call to Laws' apartment. Mr. Felice, an employee of Comfort Cab, Inc. testified that about 3 A. M. on the 19th, three Negroes (Washington, Smalls and the truck driver were Negroes) came to his office on Kinderkamack Road in River Edge to get help because their car had broken down. An attempt at jump-starting the car was made by an employee of the Cab Company but was unsuccessful and the men returned with

him to the office and made a telephone call. The records of the New Jersey Bell Telephone Company established that at 3:49 A. M. a call was made from Comfort Cab to AU 6-7324 which was the number of the telephone in Laws' apartment. When Laws testified in his own defense he acknowledged that Dennis was at his home on April 18th but denied that he stayed at the Laws' apartment through the night. Laws testified that Dennis left by about midnight and that the telephone call received by him in the early morning hour was a call to him from Dennis.

Dennis testified that at 7:30 A. M. on Monday April 19th he, along with Washington, Laws and Baker, drove in Laws' Plymouth to a side street off Kinderkamack Road, River Edge. There they pulled up in front of Baker's Oldsmobile. Washington then took a green duffel bag from the trunk of the Oldsmobile and placed it in the trunk of the Plymouth. Dennis succeeded in starting the Oldsmobile and they all then drove back to New York. Mr. Rush, a resident of River Edge, testified that he saw a car which he later identified from a photograph as the Plymouth, pull up to the Oldsmobile which had been parked beside his driveway. He said that he saw four men, one of whom was white and the others colored, standing between the cars. Austin Baker, who testified that he had loaned his car to Laws without knowledge of its intended use, stated that he had gone with Dennis, Laws and another Negro to New Jersey to bring back his Oldsmobile. Baker and Laws, as well as Washington, are Negroes and Dennis is white.

Dennis testified that about noon on April 19th he went with Washington and Laws to a pawnshop at 145th Street and Eighth Avenue in New York City. Laws pawned a ring for $30 and Washington pawned a watch for $3. Laws acknowledged that he was in the pawnshop but denied that he had gone there with Dennis and Washington. He testified that as he was leaving the pawnshop he saw Washington there. The proprietor of the pawnshop testified that the pawn tickets issued to Laws and Washington were numbered

18781 and 18782, indicating consecutive transactions. The pawnshop was open from 9 A. M. to 6 P. M. and on the day in question there were 46 transactions prior to and 200 subsequent to those of Laws and Washington.

During a search of Laws' apartment on April 27th, various items were seized by the police officials. They included a green duffel bag, .38 caliber cartridges, a lady's handbag, a brown valise, and $2,784 in United States currency. Most of the currency was found in the valise and handbag and some was found in a dresser drawer and along a window sill. Almost all of the currency was in single dollar bills. Some of these bills contained markings which were unequivocally identified by four Public Service cashiers namely, Jacobus, Hill, Mattson and Hanson, as their own individual markings. In addition, the State presented testimony by a handwriting expert that the markings were made by the same hands as those on samples identified as having been made by the cashiers.

During a search of Washington's apartment on May 1st, the officers found 533 single dollar bills under a mattress, 48 single dollar bills in a dresser drawer, and a piece of paper with the telephone number of Laws and the name "Hap" after it. The officers also found a letter to Washington bearing the return name and address of Margie Stevens, 209 West 147th Street, New York City. The officers later went to that address, saw Washington lying there in bed, searched the apartment, and seized 259 single dollar bills. Margie Stevens stated that the bills were not hers. The Public Service cashiers unequivocally identified some of them, as well as some of the bills seized in Washington's own apartment, as bearing their own individual markings.

In describing how their markings occurred, the cashiers testified that it was their practice to receive bills and coins from the bus drivers as they arrived at the terminal garage. The coins were counted by machine but the bills were counted by hand. The bills would be piled in lots of 50 and rubber bands would be placed around them. When the

amount received from the driver was less than $50, the top bill would be marked with the temporary total and, when another driver came in, the pile would be supplemented by a sufficient number of bills to total $50. The markings were placed by each cashier in his individual fashion and none of the cashiers evidenced any hesitancy in identifying his own markings.

No purpose would be served by lengthy discussion of the additional testimony introduced by the State although some of it may be mentioned in passing. Two Public Service employees identified Laws' Plymouth as the car they saw cruising around the Oradell terminal between 10 P. M. and midnight on April 22nd, several days before the robbery. The Public Service cashiers identified several small red metal caps, which were found in Laws' Plymouth after the robbery, as coming from or being similar to the caps attached to the money bags stolen during the robbery. A firearms expert testified that the pellets and wadding taken from Jaeger's body came from Remington shells similar to those seized in Laws' apartment. And a police expert testified as to the meaning of the "street talk" used in a highly incriminating note written by Laws while he was in custody after the robbery. Laws acknowledged the writing of this note but denied that it related to the robbery or the distribution of the proceeds thereof.

The defendant Washington did not testify in his own behalf but did present testimony through witnesses which included Margie Stevens. She said that he was with her at her apartment in New York during the morning of the robbery. The defendant Laws testified in his own behalf and denied all knowledge of or participation in the robbery. The jury found both defendants guilty of having conspired to commit the robbery and of murder in the first degree. That the evidence firmly supported the jury's findings appears clearly from an examination of the entire record; indeed, the joint brief submitted by the defendants in support of their respective appeals does not at any point attack the

weight or sufficiency of the evidence. However, it does advance 24 points of alleged legal error which will now be considered.

Points 1 and 2 attack the search warrants issued by Judge Murtagh of the Criminal Court of the City of New York. On April 27, 1965 Captain Spahr of the Bergen County Prosecutor's office applied to Judge Murtagh for a warrant authorizing the search of Laws' apartment No. 8 at 290 West 147th Street, New York City. He submitted an affidavit of his own, along with Dennis' affidavit which set forth that Dennis had read Spahr's affidavit and that the statements there set forth were true to Dennis' own knowledge. Spahr's affidavit stated that Dennis, a confidential informant, had told him that Hap had violated section 1897 of the Penal Laws of New York, McKinney's Consol. Laws, c. 40, and that he, Dennis, had seen a shotgun and a .38 caliber revolver on April 18th at Hap's premises. It set forth that Dennis had told about the conspiracy in Hap's home to commit the robbery in Oradell and that proceeds thereof were to be taken to Hap's apartment. Spahr's affidavit also referred to statements by Dennis that he saw ski masks and surgical gloves that Hap said would be used in robbing the terminal. Towards the close of his affidavit, Spahr stated that upon the basis of the "foregoing reliable information" and his personal knowledge there was probable cause to believe that $12,000 in silver, $13,000 in currency, a shotgun, and a .38 caliber revolver, would be found in Hap's apartment and that a search warrant should be issued forthwith because there was danger that the property would be moved.

██ The affidavits contained more than enough upon which the search warrant could properly issue. They set forth specifics which were openly ascribed to Dennis as the informant and which tied in well with the actual robbery. The defendants, while acknowledging that the affidavits accurately set forth some of the information given by Dennis to Captain Spahr, stress that the affidavits also contained

many inaccuracies. But that would not serve to invalidate the search warrant at least where, as here, the information accurately set forth in the affidavits was crucial and sufficient to establish probable cause. *Cf. Rugendorf v. United States*, 376 *U. S.* 528, 532, 84 *S. Ct.* 825, 11 *L. Ed.* 2d 887, 891 (1964); *United States v. Bowling*, 351 *F.* 2d 236, 241 (6 *Cir.* 1965); see also *United States v. Halsey*, 257 *F. Supp.* 1002 (*S. D. N. Y.* 1966).

It must be borne in mind that the affidavits were drawn by non-lawyers in the midst and haste of an urgent criminal investigation. See *United States v. Ventresca*, 380 *U. S.* 102, 108, 85 *S. Ct.* 741, 13 *L. Ed.* 2d 684, 689 (1965). They should be read sensibly rather than hypercritically and should be deemed legally sufficient so long as they contained factual assertions which would lead a prudent man to believe that a crime had been committed and that evidence, fruits, or instrumentalities of the crime, were at the place sought to be searched. See *State v. Boyd*, 44 *N. J.* 390, 392 (1965). Not only was Captain Spahr sworn before Judge Murtagh but so also was Dennis. Dennis in effect swore that he had been in Laws' apartment, had heard incriminating plans, and had seen a shotgun, revolver, ski masks and surgeons' gloves, items which corresponded with those described by the Public Service personnel at the time of the robbery. Surely the totality of the circumstances was such as to engender reasonable belief that the robbery had been planned at Laws' apartment and that search thereof would produce, as it did, incriminating evidence including some of the proceeds. Even if the issue were considerably closer than it now appears to be, we would decline on this appeal to differ with Judge Murtagh's conscientious determination that probable cause existed on the showing before him. See *State v. Mark*, 46 *N. J.* 262, 273 (1966):

"This Court has held that the State must make the issuing judge aware of underlying facts which would justify a prudent man in believing that an offense has been or is being committed (*State v. Macri*, 39 N. J. 250, 257 (1963) ) ; but it has also held that the State

need not disclose all of its evidence, that trustworthy hearsay is admissible (*State v. Burrachio*, 39 N. J. 272, 275 (1963)), that the issuing judge's finding that probable cause existed will be considered as a substantial factor tending to uphold the validity of the warrant, and that his action in issuing it will not be upset on appeal though the matter be viewed as a close one. *State v. Zuzulock*, 39 N. J. 276, 281 (1963)." 46 *N. J.* at 273.

After the search of the Laws' apartment had proved so productive, an application was made to Judge Murtagh on May 1, 1965 for a warrant authorizing the search of Apartment No. 7N, 15 West 139th Street, New York City where the defendant Washington lived with his parents. At this time Judge Murtagh had before him, not only the earlier affidavits of Spahr and Dennis, but also affidavits by Detective Patrick McKee of the New York Police Department and Detective Allmers of the Bergen County Prosecutor's office. Detective Allmers' affidavit set forth that Dennis had identified John Washington from a police photograph as one of the conspirators in the Laws' apartment on April 18th. It referred to the fact that currency, identified as part of the proceeds of the robbery, had been recovered from Laws' apartment, that Laws had been arrested, and that, according to information received from Dennis, additional proceeds would be found in Washington's apartment.

Although the foregoing was patently sufficient to justify the issuance of a search warrant for the Washington apartment, Judge Murtagh spoke by telephone with Dennis, who was then in the Bergen County Jail. Under oath, Dennis told him that he had identified Washington from a police photograph as one of the conspirators and that part of the proceeds of the robbery would be found in the Washington apartment. Judge Murtagh also spoke by telephone with Assistant Prosecutor Galda who stated under oath, that he had shown several photographs to Dennis and that Dennis had identified Washington as one of the conspirators. Although the defendants address a challenge to the propriety of Judge Murtagh's action in taking sworn statements over the telephone (*cf.* 39 *Am. Jur. Oath and Affirmation* § 14

(1942)), we need not concern ourselves with it for, as we have stated, there clearly was probable cause for the issuance of the warrant without regard to the support furnished by the confirmatory telephone information.

Point 3 of the brief contends that the joint trial denied the defendants a fair trial. In pretrial motions, Laws and Washington moved for severances which were denied. The denials were proper exercises of the trial court's discretion under the authority of the rules of court and the judicial precedents. See *R. R.* 3:4–7; *R. R.* 3:5–6; *R. R.* 3:5–7; *State v. Manney,* 26 *N. J.* 362, 365 (1958); *State v. Aiello,* 91 *N. J. Super.* 457, 465, certif. denied, 48 *N. J.* 138 (1966), *certiorari* denied, 388 *U. S.* 913, 87 *S. Ct.* 2106, 18 *L. Ed. 2d* 1351 (1967); *cf. State v. Coleman,* 46 *N. J.* 16, 24 (1965), *certiorari* denied, 383 *U. S.* 950, 86 *S. Ct.* 1210, 16 *L. Ed. 2d* 212 (1966). Washington contends that, since the evidence against Laws was stronger than the evidence against him, he was entitled to a separate trial. But the issue is not the respective weights of the evidence but the fairness of the trial as to each defendant. Throughout the trial the judge carefully advised the jury that it should consider the evidence as to each defendant separately in determining his individual guilt or innocence. There was, of course, ample reason for trying Laws and Washington jointly and the record contains nothing to indicate that either of them was denied the basic protections of fair trial.

The defendants also complain that they were prejudiced by the fact that Baker had been tried with them. Although Baker was named as a defendant, the State called him, with his counsel's consent, as one of its witnesses. He testified that when he loaned his car on April 18th to Laws, he did not know of its intended use and the State thereafter moved for his acquittal. The trial judge directed his acquittal and thereupon there was a motion for mistrial which was denied. The defendants suggest that the State knew before trial that it would move for Baker's acquittal but the record does not establish that fact. In any event,

nothing before us indicates that either Washington or Laws suffered prejudice from the joinder of Baker or from his acquittal. That being so, any criticism which may be addressed to the prosecutorial tactics does not constitute reason for reversal of the convictions under appeal here. See *R. R.* 1:5–1.

In Point 4 the defendants contend that the exclusion of a spectator from the court room deprived them of their constitutional rights. While Dennis was on the witness stand he asked the trial court to exclude his mother because her presence inhibited his testimony. At first, counsel for Laws stated that he had no objection to her exclusion, but when counsel for Washington voiced his objection, counsel for Laws joined in it. The trial court ordered the exclusion of Dennis' mother during the remainder of his testimony. While this ruling was not free from question, we fail to see how the defendants were prejudiced by it. They had a full and fair trial from which none of their friends or relatives was excluded. *Cf. State v. Haskins,* 38 *N. J. Super.* 250, 255 (*App. Div.* 1955). The precedents indicate that the trial court had some measure of discretion in the premises (*State v. Genese,* 102 *N. J. L.* 134, 142 (*E. & A.* 1925) ; *State v. Unger,* 103 *N. J. L.* 18, 20 (*Sup. Ct.* 1926), *affirmed,* 104 *N. J. L.* 448 (*E. & A.* 1928)) and its ruling was undoubtedly motivated towards freer ascertainment of the truth. In the circumstances, it would clearly disserve the interests of justice to ground a reversal on the exclusion of the witness' mother.

Points 5 through 11 address themselves to alleged errors in the trial judge's charge to the jury. The charge must be read in its entirety (*State v. Hale,* 45 *N. J.* 255, 264 (1965), appeal dismissed, 384 *U. S.* 884, 86 *S. Ct.* 1981, 16 *L. Ed.* 2d 1001 (1966)) and, as thus read, it fairly set forth the controlling legal principles and fairly submitted the crucial factual issues to the jury for its determination. The trial judge did not use the precise language set forth by the defendants in their requests to charge but

admittedly he was under no obligation to do so. *See State v. Brown,* 46 *N. J.* 96, 107 (1965). Although his review of the testimony contained minor inaccuracies, he was careful to advise the jury repeatedly that its recollection of the testimony was to govern its deliberations, rather than the respective recollections of the trial judge, as expressed in the charge, or of counsel, as expressed in their summations. It is of course well settled in our State that the trial judge has the right, and oftentimes the duty, to review the testimony and comment upon it, so long as he clearly leaves to the jury, as here, the ultimate determination of the facts and the rendering of a just and true verdict on the facts as it finds them. See *State v. Parker,* 33 *N. J.* 79, 94 (1960); *Borowicz v. Hood,* 87 *N. J. Super.* 418, 423 (*App. Div.*), certif. denied, 45 *N. J.* 298 (1965); *cf. State v. Block,* 119 *N. J. L.* 277, 281 (*Sup. Ct.*), *aff'd,* 121 *N. J. L.* 73 (*E. & A.* 1938).

During his charge, the trial judge noted that several witnesses were cross-examined with respect to earlier contradictory statements made by them. He pointed out that the earlier statements would not constitute substantive evidence but would serve to neutralize the effect of the conflicting testimony offered at trial. This represented generally accepted doctrine and affords no sound basis for the complaint advanced by the defendants. See *Wigmore, Evidence* § 1018, *p.* 687 (*3d ed.* 1940); *McCormick, Evidence* § 39, *p.* 73 (1954); but *cf.* Evidence Rule 63(1) effective September 11, 1967, Joint Resolution No. 5, 191st Legislature, Regular Session (May 9, 1967), 2 N. J. Sess. Laws Serv. 159 (1967).

The defendants complain about the judge's charge on the subject of alibi but we find the charge to have been adequate and non-prejudicial. The trial judge told the jury that, whereas the presence of the defendants at the time and place of the alleged crime was an essential link in the chain of proof, "such presence, like any other essential fact must be established by the State beyond a reasonable

doubt." He went on to point out that the defendants had presented evidence that they were not present at the time and place of the crime and that this defense was known in the law as an alibi. *Cf. State v. Garvin,* 44 *N. J.* 268 (1965). He then told the members of the jury that in considering evidence that a defendant was not present they could find either that the defendant was present, that he was absent, or that the testimony created such a degree of uncertainty as to his whereabouts that they were not satisfied beyond a reasonable doubt of his guilt of the crime as charged in the indictment and "if the testimony of that question alone raises a reasonable doubt the defendant is entitled to an acquittal."

Although the defendants complain that the trial judge failed to tell the jury that "the burden of proving alibi never rests upon the defendant", that was the clear purport and effect of his charge. In his charge, he pointed out that the State had the burden of proving all the essential elements of the crime beyond reasonable doubt, and when he was discussing the subject of alibi he specifically referred to the fact that the State had the burden of establishing the defendant's presence *as it did other essential facts beyond* reasonable doubt. Surely any inartistry in the language used by the trial judge could not have misled the jury. We are entirely satisfied that the charge on the subject of alibi, which was not objected to at trial, was legally sufficient and that the defendants suffered no harm from the trial judge's failure to expand on it in the manner now outlined by them in their brief. See *State v. Garvin, supra,* 44 *N. J.,* at *pp.* 272–275; *State v. Peetros,* 45 *N. J.* 540, 544–545 (1965).

During its direct examination of Dennis, the State brought out that by order of the Juvenile Court he had been committed for certain juvenile offenses. If he had been an adult, his record of conviction could of course have been introduced on cross-examination to attack his credibility. *N. J. S.* 2A:81–12. It could also have been introduced on direct examination by the State. *State v. Holley,* 34 *N. J.*

9, 13, *certiorari* denied, 368 *U. S.* 854, 82 *S. Ct.* 89, 7 *L. Ed. 2d* 51 (1961); *State v. Fox,* 12 *N. J. Super.* 132, 139 (*App. Div.* 1951). But the clear legislative policy is that adjudication of juvenile offenses should not be viewed as criminal convictions and should "not be admissible as evidence" against the juvenile in any other court proceedings. *N. J. S.* 2A:4–39; *State v. De Paola,* 5 *N. J.* 1, 18 (1950); *State v. Wolak,* 26 *N. J.* 464 (1958); see *Thomas v. United States,* 74 *App. D. C.* 167, 121 *F. 2d* 905, 907–908 (1941); *Brown v. United States,* 119 *U. S. App.* 203, 338 *F. 2d* 543, 547 (1964); *McCormick, supra,* § 43, *p.* 91, *n.* 16.

In view of this policy, which we consider applicable though the juvenile is a witness, as here, rather than a defendant as in *De Paola* and *Wolak* (see *Thomas v. United States, supra; Brown v. United States, supra*), the State might well have withheld its evidence with respect to Dennis' juvenile adjudications although its action in taking a contrary course was helpful rather than harmful to the defendants. During their cross-examination of Dennis and in their summations, counsel for the defendants bore heavily, not only on Dennis' juvenile offenses, but also on the discrepancies and contradictions in his testimony and statements.

In his charge, the trial judge referred to evidence that Laws and certain witnesses had been convicted of crime, and he pointed out that this evidence was received solely for the purpose of affecting credibility. See *State v. Hawthorne,* 49 *N. J.* 130 (1967). He cited the juvenile offenses of Dennis and noted that under the law "such offenses are designated as juvenile transgressions and no person under the age of 18 years shall be deemed a criminal by reason of any adjudication relating to such offenses nor shall such an adjudication be deemed a conviction of a crime." He then charged that "evidence of such transgressions are not to be considered by you to affect his credibility as a witness in this case." By this last remark the trial judge presumably intended no more than to refer to the legislative policy hereinbefore mentioned (*N. J. S.* 2A:4–39).

The defendants contend that this last remark withdrew the discrepancies and contradictions in Dennis' testimony from the jury's consideration and had the practical effect of misleading the jury into concluding that his testimony was "absolutely trustworthy." We are satisfied that it could not and did not have any such effect. Elsewhere in his charge, the trial judge told the members of the jury that they were the sole judges of the facts and were to determine the credibility of the witnesses; that in determining whether a witness was credible they could take into consideration, his appearance, his interest, the manner in which he testified, and matters of logic, reasonableness and probability; and that if they believed that a witness willfully testified falsely as to any material fact they could give such weight to his other testimony as they thought it was entitled to or disregard it altogether. The trial judge referred to the phrase "false in one thing, false in all" as a permissible inference and concluded with the comment that if the evidence was "reasonably susceptible of two constructions, one of the guilt and one of the innocence of the accused, the latter should be adopted." It is clear from the whole record that, in accepting the verity of the crucial portions of Dennis' testimony, the jury rested on the weighty independent corroboration rather than on any notion of Dennis' general worth and probity. We are convinced that the trial judge's charge bearing on Dennis' juvenile transgressions did not constitute prejudicial error.

Point 12 asserts that "the trial judge committed reversible error by permitting the prosecutor to establish improperly and unnecessarily the illegitimacy of Laws' son." Lieutenant Ennis, testifying as a State's witness, said that Mrs. Laws told him that her son was 17 years old and that she had been married in January 1965. When Mrs. Laws was testifying for the defense, she was asked on cross-examination whether her name was Carolyn Wynn or Carolyn Laws. She replied that it was Carolyn Laws but stated that her apartment and telephone were still listed in her maiden

name of Carolyn Wynn. This latter testimony was admissible since there was material evidence in the record with respect to calls from and to the telephone listed in the name of Carolyn Wynn. In the light of all of the foregoing we fail to find anything of significance in the point of error urged by the defendants; in any event it may safely be said that it played no part in the jury's findings of guilt.

In their 13th and 14th Points, the defendants contend that the extent of the intervention by the trial judge and prosecutor during the trial, deprived them of a fair trial. The trial judge has the power and oftentimes the duty to intervene in the questioning of witnesses. His responsibility is to see that the trial is a fair one and that it is conducted in orderly and expeditious manner. See *State v. Guido*, 40 *N. J.* 191, 207 (1963) ; *State v. Ray*, 43 *N. J.* 19, 26 (1964). Canon 15 of the Canons of Judicial Ethics sets forth that the trial judge may intervene to promote expedition, prevent unnecessary waste of time and clear up obscurities but that he should bear in mind that "his undue interference, impatience or participation in the examination of witnesses, or a severe attitude on his part towards witnesses", may tend to prevent the proper presentation of the cause or the ascertainment of the truth in respect thereto.

The record leaves us with little doubt that the trial could readily and properly have been conducted with much less intervention by the trial judge and with much less objection and intervention by the prosecutor and defense counsel. Nonetheless it cannot be said that the defendants were in any sense denied a fair trial. Counsel for each defendant was afforded great leeway in the admission of evidence and in summation, and the trial judge's charge set forth all of the protective principles to which the defendants were entitled. We are satisfied that such wastage as resulted from the unnecessary intrusions in the taking of testimony did not impair the fairness of the trial or the justness of the verdicts.

182 

 In their 15th, 16th and 20th Points, the defendants attack the legality of the indictments returned against them. The attacks were not made below until the very day on which the trial began. That was too late (*R. R.* 3:5–5(b)(2))), and, in any event, the attacks lacked merit. The defendants were indicted for murder by the Bergen County Grand Jury for the second stated session of the September 1964 Term. That Grand Jury was discharged on May 3, 1965 but apparently the murder indictments were not filed with the county clerk until May 18, 1965. There is nothing in the record to suggest that the indictments were not returned in open court before the Grand Jury was discharged (*State v. Rhodes,* 11 *N. J.* 515, 519 (1953)), and the delay in filing the indictments with the county clerk had no bearing on their validity.

The defendants moved below for examination of the minutes of the Grand Jury but their motions were denied. The prosecutor stated that no minutes had been taken and, in any event, the defendants presented no valid reason for departing from the Grand Jury secrecy requirements expressed in *R. R.* 3:3–7. *Cf. State v. Farmer,* 45 *N. J.* 520 (1965); *State v. Tate,* 47 *N. J.* 352 (1966). Although the discovery rules in criminal cases were being restudied by this court, the defendants were in no position to rely on prospective revision. See *State v. Green,* 49 *N. J.* 244 (1967); *State v. Yough,* 49 *N. J.* 587 (1967). Apparently the defendants were seeking to determine whether the indictments were returned on the basis of the written statements given to the police rather than on direct oral testimony from those who made the statements. Even if they were so obtained, the indictments would not, under precedents which we are not now called upon to reexamine, be vulnerable to attack. See *State v. Dayton,* 23 *N. J. L.* 49, 56 (*Sup. Ct.* 1850); *State v. Garrison,* 130 *N. J. L.* 350, 351 (*Sup. Ct.* 1943); *State v. Grundy,* 136 *N. J. L.* 96, 99 (*Sup. Ct.* 1947).

On the day that the trial began, counsel for the defendants made motions "challenging the array of the Grand Jury." Their stated ground was that "members of the defendants' color have not been on the Grand Jury in the numbers that ought to be." When the trial judge asked what those numbers were, counsel said they did not know but they thought they would "have to investigate." The trial judge then pointed out that counsel had had many months to investigate and that they were not at liberty to move so belatedly and without supporting materials, for a general investigation as to the manner in which Grand Juries in Bergen County were being chosen. After noting that many Bergen County Grand Juries had colored members, the trial judge denied the challenge to the array. Under the circumstances, any other course would have grossly disserved the orderly administration of justice.

In their 17th and 18th Points, the defendants complain about the prosecutor's failure to advise them in advance of trial that the testimony of certain witnesses would depart from their earlier statements. The defendants made discovery motions before trial which were not ruled upon when the prosecutor said that he would open his files to them. With this cooperation, the defendants obtained very broad discovery including copies of the statements made by the State's prospective witnesses. *Cf. State v. Hunt*, 25 *N. J.* 514 (1958). At the trial, the State's witnesses were cross-examined extensively, and where their trial testimony varied from their earlier statements, defense counsel appropriately stressed the variances before the jury. Pretrial statements by witnesses often do not coincide fully with their trial testimony and defense counsel were undoubtedly aware of this. We see no prejudice here or any ground for reversal.

In their 19th Point, the defendants complain about the prosecutor's refusal to accept a stipulation which they tendered at the beginning of the trial. They offered to stipulate all of the facts as to the robbery and killing; except

the identity of the offenders. The State rejected this offer and was within its rights in doing so. The defendants do not suggest that there is any authority for their position but urge the adoption of a new rule compelling the State in criminal prosecutions to stipulate "those facts which the accused do not dispute." We decline to do so for, subject to the trial judge's overriding control of the proceedings, the State should have the right to make a full showing before the jury whenever it considers such course necessary for the proper presentation of its case.

Points 21 and 22 of the defendants' brief embody attacks on the selection of the petit jury which heard the case. The primary complaint is that prospective jurors who said that they were conscientiously opposed to capital punishment were excused for cause. But our law expressly provides for capital punishment and the State was entitled to a jury composed of persons who would feel free to return verdicts calling for it. See *State v. Rios,* 17 *N. J.* 572 (1955) where this Court noted that "since the crime of which the defendants were accused carried the death penalty, the trial court could properly ascertain whether prospective jurors were unable, because of their scruples, to render a verdict requiring capital punishment. The State is entitled to a jury which is not prejudiced against its established laws and statutory enactments." 17 *N. J.,* at *pp.* 590–591.

The defendants also complain about the seating of Mr. Barrett who was juror No. 1. During the voir dire, counsel for the defendant Washington stated that he would probably have his client testify and he referred to the fact that Washington had on two prior occasions pleaded guilty in New York to charges of robbery. Counsel for Washington inquired whether these prior convictions would have any influence and Mr. Barrett replied that he thought "there would be some influence" although he would try to the best of his ability to disregard the convictions. The trial judge then instructed Mr. Barrett that if Washington testified, his prior convictions would be admissible "merely for

the purpose of affecting his credibility" and the judge inquired whether Mr. Barrett would take the instruction "as the applicable law in this case." Mr. Barrett replied that he would. Later he repeated that he would disregard the prior convictions to the best of his ability and would follow the court's instructions.

In response to inquiries, Mr. Barrett stated that he agreed with the concept of the law that an accused stands innocent until proven guilty beyond any reasonable doubt and that he believed he could sit as an impartial juror and properly discharge his responsibilities as such. A reading of his entire voir dire leaves one with the firm view that he was well qualified and was properly selected; in any event the trial judge did not exceed his broad discretion in declining to discharge Mr. Barrett for cause. See *State v. Grillo*, 16 *N. J.* 103, 112 (1954). It may be noted that neither Washington's nor Laws' counsel chose to discharge him peremptorily though both counsel had unused peremptory challenges after the jury was selected. See 5 *Wharton, Criminal Law and Procedure* (*Anderson ed.* 1957) § 2001, *p.* 136.

The defendants' penultimate Point (23) asserts that there was a prejudicial variance between the allegations in the conspiracy indictment and the State's proof and summation. The indictment charged that on April 18, 1965, there was a conspiracy at Laws' apartment to rob the Oradell terminal. Dennis testified as to the events on April 18th but he also testified as to a meeting shortly prior to the 18th at which time he and his brother were in Laws' apartment. Dennis said that on that occasion his brother left the room and conferred privately with Laws. In his summation the prosecutor urged that Dennis' brother had "fingered the job" during this earlier meeting. No objection was made during the trial to the admission of the evidence of the earlier meeting or to the prosecutor's summation; in any event we find no error.

██ ██ The fact that the conspiracy indictment specified April 18th did not preclude the State from introducing the evidence of the earlier meeting. The specified date was not of the essence of the conspiracy and evidence that the conspiracy may have started at an earlier date and then continued on the specified date did not prejudicially depart from the charge in the indictment. See *State v. Friedman,* 135 *N. J. L.* 419, 421 (*Sup. Ct.* 1947), affirmed, 136 *N. J. L.* 634 (*E. & A.* 1948) ; *Pearlman v. United States,* 20 *F. 2d* 113, 114, (9 *Cir.*), *certiorari* denied, 275 *U. S.* 549, 48 *S. Ct.* 85, 72 *L. Ed.* 419 (1927). The prosecutor's argument that Joseph Kingsley fingered the job at the earlier date was a permissible one as was his argument which dealt with the division of the proceeds of the robbery. It must be borne in mind that considerable summation latitude is afforded to the prosecutor as well as to defense counsel in drawing reasonable inferences from the evidence in the record.

The defendants' final (24) but most important Point, urges that the trial court's charge violated the principles enunciated by this Court in *State v. White,* 27 *N. J.* 158 (1958). See also *State v. Maxey,* 42 *N. J.* 62, 67 (1964) ; *State v. Hudson,* 38 *N. J.* 364, 374 (1962) ; *People v. Morse,* 60 *Cal. 2d* 631, 36 *Cal. Rptr.* 201, 214, 388 *P. 2d* 33, 46 (1964) ; *Burnette v. State,* 157 *So. 2d* 65, 69 (*Fla.* 1963). *White* pointed out that the jury has no concern with parole and, so far as it is concerned, a life sentence means confinement for life. *White* carefully set forth the following model instruction to be given in a murder case where the jury inquires as to a life termer's chances of release:

"Any prisoner serving a sentence of life is eligible for consideration for release on parole after having served 25 years of his sentence, less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments. The statute provides that no prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned to him, but only if the State Parole Board is of the opinion that there is reasonable probability that, if such prisoner

is released, he will assume his proper and rightful place in society, without violation of the law, and that his release is not incompatible with the welfare of society. A prisoner released on parole remains on parole for the balance of his life and if he violates the terms of the parole he may be returned to prison to serve the life sentence.

I have answered your question, but instruct you that the subject of possible parole must be excluded from your deliberations. You may not speculate as to whether parole would or would not be granted. So far as you are concerned, a life sentence is a life sentence. If upon and after consideration of all the evidence you believe a recommendation for imprisonment for life should be made part of your verdict, it would be a violation of your duty to refuse to make that recommendation because of the existence in another authority of the power and responsibility with respect to parole." 27 *N. J.*, at *p.* 179.

In the case at hand the jury, after deliberating over three hours, returned to the court room with the following question: "Can a jury render a verdict of life imprisonment without possibility of parole and make it binding." It may fairly be inferred that the jury was then satisfied beyond reasonable doubt that the defendants Laws and Washington were guilty of murder in the first degree and was considering recommending life imprisonment as it had the undoubted right to do. See *N. J. S.* 2A:113–4. At that point the trial judge should have given the jury an instruction comparable to that set forth in *White;* instead all he said in response to the jury's inquiry was: "The answer is no." Two hours later the jury returned its first degree verdicts of guilt without recommendation and the defendants were consequently sentenced to death. *N. J. S.* 2A:113–4. There was plain error and the death sentences may not be permitted to stand. *State v. White, supra,* 27 *N. J.,* at *pp.* 170–179.

Thus the single point of prejudicial error appearing from a thorough examination of the extensive trial record relates to sentence and not to the issue of guilt. That being so the question immediately presents itself as to whether the administration of justice would not now best be served by modification of the murder convictions and the imposition of life imprisonment, rather than by reversal and lengthy

retrial. See *R. R.* 1:5–1; *R. R.* 1:9–1; *State v. Garton,* 102 *N. J. L.* 318, 321 (*E. & A.* 1926) ; *State v. Burns,* 136 *N. J. L.* 601, 603 (*E. & A.* 1948). Although neither the State's brief nor the defendants' brief dealt with the question, it was raised at oral argument. The State, which admittedly could have waived the death penalty before or at trial (*In Re Waiver of Death Penalty,* 45 *N. J.* 501 (1965)), took the position that the murder convictions should not now be reversed but should be modified so that the defendants Laws and Washington would stand convicted of murder in the first degree with sentence of life imprisonment. The defendants, however, took the position that this Court lacked the power to so modify and that consequently there must be a complete retrial. But see *State v. Ramirez,* 34 *Idaho* 623, 203 *P.* 279 (1921) ; *Davis v. State,* 155 *Ark.* 245, 244 *S. W.* 750 (1922) ; *Frady v. United States,* 121 *U. S. App. D. C.* 78, 348 *F. 2d* 84 (*D. C. Cir.*), certiorari denied, 382 *U. S.* 909, 86 *S. Ct.* 247, 15 *L. Ed. 2d* 160 (1965) ; *Coleman v. United States,* 123 *U. S. App. D. C.* 103, 357 *F. 2d* 563 (1965) ; cf. *Hubka v. State,* 40 *Okl. Cr.* 161, 267 *P.* 864 (1928) ; *Commonwealth v. Garramone,* 307 *Pa.* 507, 161 *A.* 733, 89 *A. L. R.* 291 (1932) ; *Austin v. United States,* 126 *U. S. App. D. C.* —— 382 *F. 2d* 129 (*D. C. Cir.* 1967) ; Hall, *Reduction of Criminal Sentences,* 37 *Colum. L. Rev.* 521, 762, 771–773 (1937) ; Knowlton, *Problems of Jury Discretion in Capital Cases,* 101 *U. Pa. L. Rev.* 1099, 1129 (1953) ; Oberg, *Trial Courts' Power to Reduce Punishments Fixed by Juries in First Degree Murder Trials,* 13 *Hastings L. J.* 474 (1962) ; *A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences, pp.* 13–20 (*Tent. Draft,* April 1967). See also *State v. Mull,* 30 *N. J.* 231, 239 (1959) ; *State v. Johnson,* 67 *N. J. Super.* 414, 424 (*App. Div.* 1961). Compare *Commonwealth v. Aljoe,* 420 *Pa.* 198, 216 *A. 2d* 50 (1966) with *Commonwealth v. Smith,* 405 *Pa.* 456, 176 *A. 2d* 619 (1962) ; see *State v. Hall,* 176 *Neb.* 295, 125 *N. W. 2d* 918,

926 (1964); *People v. Thomas,* 37 *Cal.* 2d 74, 230 *P.* 2d 351, 353 (1951).

The issue with respect to the power to modify carries with it important connotations in the administration of the criminal law. It should be briefed and argued fully. Since this has not been done, we have decided to call for a reargument of the cause which will, however, be confined to that single issue. The Clerk will advise the parties as to when their briefs are to be filed and as to the date of reargument; the Attorney General will be invited to file a brief and argue *amicus curiae.*

So ordered.

FRANCIS, J. (concurring). I concur in the result reached by the Court. In view of the importance as well as the unusual character of the question upon which reargument is sought, I feel the need for some additional comments.

The majority opinion expresses the view that when the question arose during oral argument of the appeal as to our authority to change the death sentence fixed by the jury to life imprisonment, the State "took the position that the murder convictions should not now be reversed but should be modified so that the defendants Laws and Washington would stand convicted of murder in the first degree with sentence of life imprisonment." As the opinion says, the matter was not discussed in either brief, and only arose during oral argument. Since it arose in that fashion, I do not believe that the special assistant prosecutor's comments should be regarded as a solemn stipulation given after full deliberation and thorough consultation with the prosecutor. For this reason, and because of the novelty of the issue involved, if the above quotation does represent the prosecutor's view, it seems to me that we ought to have a written statement from him in his forthcoming brief, or in any form in which he cares to submit it, to the effect that if the trial court erred in answering the inquiry of the jury about parole and that is the only prejudicial error in the case, he is satisfied to waive the death penalty imposed by

the jury and to have this Court vacate that sentence and substitute for it a sentence of life imprisonment, in the event the Court decides it has the authority to do so.

For purposes of perspective it should be noted that the controlling statute, *N. J. S.* 2A:113–4 says:

"Every person convicted of murder in the first degree * * * shall suffer death *unless the jury* shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence, recommend life imprisonment, *in which case this and no greater punishment shall be imposed.*" (emphasis added)

Because of the unusual language employed by the Legislature, it seems to me (without indicating any view in the matter) that special consideration should be given to the following problems:

(1) Assuming the Court on appeal in the ordinary criminal case has the power to review the sentence imposed by a trial judge and to modify it if deemed excessive or to impose a proper sentence if the one imposed is illegal, has the Legislature committed the authority to fix the sentence at death or life imprisonment to the jury alone in first degree murder cases upon its finding that the defendant is guilty of murder in the first degree? See the history of *N. J. S.* 2A:113–4 in *State v. Sullivan,* 43 *N. J.* 209, 241–247 (1964).

(2) Since the statute appoints the jury to exercise its direction "upon and after the consideration of all the evidence" as to whether to recommend life imprisonment, can this Court solely because of an error by the trial court on a matter unrelated to the issue of guilt or innocence, set aside the jury's judgment that the heinous nature of the murder warrants the death penalty and impose a sentence of life imprisonment?

(3) In such a situation in view of the statutory language should not the Court vacate the death sentence and remand the matter for retrial by a jury on the matter of punishment alone?

(4) If prejudicial trial error was committed on a matter unrelated to a defendant's guilt or innocence of the murder, would not this Court on appeal be required to treat it as reversible error calling for a new trial unless the Court, apart from the error, overrules the exercise of the jury's discretion as to punishment and then considers all the evidence in the case, "and upon and after a consideration" of all of it, decides that in *its* discretion, contrary to that of the jury, the punishment should be life imprisonment rather than death?

(5) If question 4 is answered in the affirmative, does it follow that regardless of *N. J. S.* 2A:113-4, this Court may exercise its discretion independently of the jury in all cases where the jury decides upon the death penalty after a consideration of all of the evidence, and change the death sentence to life imprisonment, if in its discretion the death penalty is too severe under the circumstances? *Cf. Commonwealth v. Smith,* 405 *Pa.* 456, 176 *A. 2d* 619 (1962).

(6) (a) In future trials of first degree murder cases, where the death penalty is sought, should not bifurcated trials be employed, the issue of guilt being tried first, and immediately upon return of a verdict of guilt of first degree murder, the issue of a punishment, *i. e.,* death or life imprisonment be tried out before the same jury?

(b) Does not the doctrine of *State v. Mount,* 30 *N. J.* 195 (1959) and kindred cases make this course advisable? See *United States v. Curry,* 358 *F. 2d* 904 (*2d Cir.* 1966); Note, 52 *Va. L. Rev.* 359 (1966); The Two Trial System in Capital Cases, 39 *N. Y. U. L. Rev.* 50 (1964); Model Penal Code § 210.6 (Proposed Official Draft, 1962).

HANEMAN, J., joins in this concurring opinion.

*For reargument*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN.—7.

*Opposed*—None.